**UNITED STATES of America,
Plaintiff,**

v.

**Peter Vincent BOESEN, Defendant.**

No. 4:05–cr–00262–JEG.

United States District Court,
S.D. Iowa.

Feb. 6, 2007.

934

Mary C. Luxa, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

Guy R. Cook, Clark I. Mitchell, Nicholas J. Mauro, Grefe & Sidney, Des Moines, IA, for Defendant.

## ORDER

GRITZNER, District Judge.

This matter is before the Court on Defendant's August 13, 2006, Motion for New Trial and Judgment of Acquittal, and the Government's September 5, 2006, Motion for Order of Preliminary Forfeiture of Property. Both parties have filed responses to the pending motions. Hearing on the Government's motion took place on September 18, 2006; hearing on Defendant's motion took place on December 18, 2006. Defendant was represented by attorneys Guy Cook and Nicholas Mauro. The Government was represented by Assistant United States Attorney Mary Luxa. As directed by this Court's Order of December 18, 2006, supplemental briefing on the forfeiture issue was filed by the Government on January 8, 2007, and by the Defendant on January 15 and January 24, 2007.[1] The matter is fully submitted for review.

## PROCEDURAL BACKGROUND

On December 14, 2005, a grand jury indictment was filed in the above-captioned case. The indictment contained 57 counts against Defendant Peter V. Boesen ("Defendant") and co-defendant James Boesen, charging them with conspiracy to commit health care fraud (count one) and specific acts of health care fraud (counts two through 56). The indictment also contained a forfeiture count (count fifty-seven). On February 15, 2006, a superseding indictment was filed, which contained eighty-four counts against both defendants. The superseding indictment again

---

1. Defendant's counsel further provided the Court with a letter on January 30, 2007 regarding forfeiture amounts after the claimed set-off and the value of Counts 65–67.

charged both defendants with conspiracy to commit health care fraud (count one) and specific acts of health care fraud (counts two through eighty-three). The superseding indictment also contained a forfeiture count (count eighty-four).

A trial against both defendants began on July 24, 2006. The jury returned its verdict on August 7, 2006. Both Defendant and co-defendant James Boesen were found guilty on counts one through eighty-three of the superseding indictment, and the jury was excused from service. Having reserved ruling on co-defendant James Boesen's Rule 29 motion pursuant to Fed. R.Crim. Pro. 29(b), once the jury was excused, the Court addressed the motion. As required by the rule, the Court considered the evidence as it was at the close of the Government's case and in the light most favorable to the Government. Upon careful consideration, the Court concluded that no reasonable jury could find beyond a reasonable doubt that co-defendant, and nonphysician, James Boesen had the necessary knowledge of actual underlying medical procedures and the inconsistency with billings, and therefore the requisite intent and knowledge of the purpose of a conspiracy, to be found guilty of any of the counts charged against him. Co-defendant James Boesen's Rule 29 motion was therefore granted, and James Boesen was acquitted on all counts charged against him in the superseding indictment. As a result of the Court's ruling on James Boesen's Rule 29 motion, the Court necessarily had to find Defendant Peter Boesen not guilty as to count one, the conspiracy count, as there were no other unnamed co-conspirators. *United States v. Peterson,* 488 F.2d 645 (5th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974) (if the other conspirator has been acquitted of the conspiracy, there can be no conviction of the sole remaining alleged conspirator). The Court found the matter at bar did not implicate the rule of *United States v. Mor-*

*ton,* 412 F.3d 901, 904 (8th Cir.2005), because the determination was being made as a matter of law by the Court on a reserved ruling under Rule 29(b), following the jury verdict, and would not therefore implicate the considerations set out in *Morton* based upon *United States v. Powell,* 469 U.S. 57, 65–7, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

In his post-trial Motion for Judgment of Acquittal and Motion for New Trial, Defendant contends that (1) he is entitled to a judgment of acquittal or a new trial with respect to counts two through fifty-two and counts sixty-five through sixty-seven; (2) misconduct of the Assistant United States Attorney in various respects deprived him of his right to a fair trial; (3) the interests of justice dictate he is entitled to a new trial free from the unduly prejudicial evidence related to the conspiracy charge; (4) the admission of Agent Kohler's summary charts deprived him of a fair trial; (5) he was deprived of his right to cross-examine his accusers with DVD's that depicted the procedures at issue; and (6) the length of jury deliberations illustrate the unfairness of the proceedings.

## APPLICABLE LAW AND DISCUSSION

### *Motion for judgment of acquittal.*

▉ Rule 29(a) states that the court may grant a defendant "a judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed. R.Crim.P. 29(a). The district court has very limited latitude when considering a motion for acquittal. *United States v. Hernandez,* 301 F.3d 886, 889 (8th Cir. 2002). "In ruling on a motion for judgment of acquittal, the role of the district court is not to weigh evidence or consider the credibility of the witnesses, but rather

to determine whether the Government has presented evidence on each element sufficient to support a jury verdict." *United States v. Chavez*, 230 F.3d 1089, 1091 (8th Cir.2000). Focusing upon the level of evidence presented by the Government and whether that evidence could support the jury determination, "[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir.2002).[2]

■ In order to establish guilt of the crime of health care fraud, the Government had to prove beyond a reasonable doubt at trial that Defendant knowingly and willfully executed or attempted to execute a scheme or artifice to defraud a health care benefit program by means of materially false or fraudulent representations or omissions, that the health care benefit program affected commerce, that the scheme or artifice to defraud was in connection with the delivery of or payment for health care benefits, items, or services, and the Defendant did so with the intent to defraud. 18 U.S.C. § 1347; *United States v. Cooper*, 283 F.Supp.2d 1215, 1232 (D.Kan.2003). Defendant does not challenge the verdict on all of these elements but focuses on whether the Government has demonstrated materially false or fraudulent representations or omissions, a scheme or artifice to defraud, and the requisite intent.

In support of his argument that he is entitled to a judgment of acquittal with respect to counts 2 through 52, Defendant cites to a portion of the testimony of Dr. Thomas Kidder, a board certified otolaryngologist who testified on behalf of the Government. Defendant asserts that Dr. Kidder's unrebutted testimony regarding the procedures at issue in counts 2 through 52, which pertained to the nasal endoscopy with debridement procedure (CPT[3] code 31237), was such that no reasonable jury could have found Defendant guilty on any one particular procedure beyond a reasonable doubt. Defendant cites to the following portion of Mr. Weinhardt's cross-examination of Dr. Kidder for support:

Q: All right. You can have crusting of the mucous or drying of the mucous without having allergic fungal sinusitis, cystic fibrosis, and et cetera, correct?

A: Oh, yes.

Q: And you could, without anesthetic, remove that crusted or dried mucous using an endoscope and some other tool?

A: Right. Assuming that you have a patient that will tolerate it and you do it gently, yes, you could do that.

Q: And you would say that's a debridement if you did that?

A: Yes.

Q: And so how many of the cases could there be in the indictment that sort of mismatch, a removal of dried or crusted mucous and nonetheless a mismatch between that procedure which you will call a debridement and the medical record that was written?

---

2. It is this Court's duty to review the current motion under this standard and under the standard for a new trial set forth at pages 13 to 14, *infra*. The Court has to date received 74 letters from friends, colleagues, and patients of Dr. Boesen, in many instances asking this Court to exercise its own judgment in weighing the evidence and in the ultimate determination of the guilt or innocence of Dr.

Boesen. While these letters have all been read and their sentiment appreciated, this Court has clearly defined legal authority and obligations that do not include substituting its judgment for that of the jury, if there is legally sufficient evidence to support the jury verdict.

3. Current Procedural Terminology.

A: I believe a number of his cases that is probably what happened is that he removed crusts or dried secretions from the nose using suction or forceps and the endoscope to see what he was doing.

Q: And you have no way of giving us a firm number of how many of the cases that is as you sit here today?

A: I don't have that number on the top of my head. I would have to go back through all of these records and try to list them.

Defendant claims that Dr. Kidder never went over the records to identify such a list; therefore his undisputed, unrebutted testimony is that the removal of dried or crusted mucous constitutes a debridement, and that is what indeed occurred in a number of the counts charged. This limited portion of the testimony of Dr. Kidder is what Defendant relies upon for asserting that he is entitled to a judgment of acquittal with respect to counts 2 through 52. The Court cannot weigh this testimony in isolation but must consider the entire record.

Dr. Kidder testified that in forming his opinions regarding the actions of Defendant, he reviewed Defendant's patient files, including notes that were generated by Defendant, Defendant's dictations, operative reports, pathology reports, and CT scan reports. Dr. Kidder testified that he reviewed the entire medical file of each patient, to the extent it was presented to him. While Dr. Kidder's testimony cited above, in which he indicated that the removal of dried or crusted mucous could constitute a debridement, may in fact be correct, Defendant's own patient notes do not reflect that is what he removed. Dr. Kidder testified that Defendant's own patient notes or dictations indicated he was removing either granulation tissue or synechial banding; they did not indicate he was removing dried or crusted mucous. The Court could find only one count, count 19, which pertained to an April 25, 2002, nasal debridement procedure (CPT 31237) allegedly performed on patient Heather Henschel, where Dr. Kidder testified that the patient notes indicated Defendant debrided inspissated mucopus. Dr. Kidder went on to testify that he found these particular patient notes suspect for other reasons.[4]

Dr. Kidder testified that there were a number of things he felt were either patterns or trends that ran throughout all of the patients' records relative to the nasal debridement procedure, which provided the basis of his opinion that Defendant did not actually perform the nasal debridement procedures as claimed in his patient notes. For instance, Dr. Kidder noted a great deal of similarity in all of the detailed patient notes, and that Defendant's descriptions of a patient from one visit to another, even over a three to five year period of time, and his description of different patients, were very similar to one another, in fact almost identical in some cases. Dr. Kidder testified that both the wording and the findings were the same, and that in his experience, there is a fair amount of variation in patients who come into the office of the general ENT doctor, and very seldom do you have patients who all have identical findings and the identical type of procedure performed.

Another similarity Dr. Kidder found in the patient notes that he deemed odd was

---

4. Specifically, Dr. Kidder testified that the patient notes stated that the maxillary ostium was widened posteriorly. Dr. Kidder found this notation striking because this patient did not have an antrostomy, which meant Defen- dant would have enlarged the patient's actual ostium in his office without using any anesthetic, a procedure which Dr. Kidder testified would have been virtually impossible under those conditions.

the fact that the patient notes almost always indicated granulation tissue was removed. Dr. Kidder found this hard to explain because there was nothing to indicate the patients had prior sinus surgery that would cause granulation tissue to form; and further, if a patient has significant granulation tissue forming independent of an intervention such as sinus surgery, the clinician should be considering the possibility that the patient may have some unusual type of disease, such consideration tending to mandate a biopsy of the tissue be performed. Yet of the hundreds of debridements done by Defendant on patients who did not have prior sinus surgery, where he claimed to have removed granulation tissue, very rarely did Defendant ever send any actual tissue for examination by a pathologist.

Another issue Dr. Kidder found common to the nasal debridement patients was that no topical anesthetic was used, despite the fact that the procedures Defendant described doing in his patient notes, particularly enlarging the sinus ostium or enlarging the antrostomy site, or even getting up into the frontal recess, would require an anesthetic.

Dr. Kidder also noted that in about the mid to late part of 2002, Defendant's practice suddenly changed, in that Defendant pretty much stopped performing nasal debridements on patients on whom he had previously performed the procedure for years, with the patient notes now describing that either the patient had no evidence of sinus disease, the nose valve was clear, or, if the patient was diagnosed with sinusitis, Defendant did not feel it was necessary to perform the nasal debridement that he had allegedly done in the past.[5] Further, Dr. Kidder noted that there were a couple of patients on whom, when Defendant took them to the operating room, he did bilateral surgery, whereas the pathology was unilateral. Dr. Kidder provided specific testimony regarding each patient at issue and testified that based upon his knowledge as an otolaryngologist and his review of the medical documentation in this case, it was his opinion that Defendant did not correctly report what he truly observed or the procedures he truly performed on his patients.

Generally supportive testimony was received from Dr. Thomas Paulson, a board certified otolaryngologist, who testified that a nasal endoscopy with debridement procedure is normally done in occasional instances after an extensive sinus surgery. Dr. Paulson testified that he has never heard of an ENT physician performing twenty or more debridements on a post-surgery sinus patient, and he could conceive of only one or two rare diseases, such as Wegener's disease, that might cause the kind of crusting that might need over a period of many years numerous debridements. Dr. Paulson testified he could not conceive of any need for a debridement for the routine patient who has had no sinus surgery. Dr. Paulson also testified that it was his opinion that it would be very difficult to do a nasal debridement to any extent without using topical anesthetic.

More specifically to the practices in the Boesen Clinic, Dr. Heidi Close, an otolaryngologist and former employee of the Boesen Clinic, testified that it was her perception based upon working with Defendant that Defendant exaggerated his diagnosis of patients and the procedures he performed. Dr. Close testified that while she believed Defendant did a nasal endoscopy on the patients, she questioned whether he did an actual debridement.

Kim Pollock, an employee of Karen Zupko & Associates, a company that consults

5. A reasonable juror could connect this sudden change in treatment to inquiries made by health insurers questioning the validity of the procedures.

with physicians regarding the business operations of a medical practice, testified that in 2002 the Boesen Clinic sent her a group of patient records for review. Upon a review of the patient records, Pollock concluded the documentation was not supportive of the CPT coding for which the Boesen Clinic was billing the insurance companies. Pollock testified that based upon a conclusion that these patient records may be incriminating, they were returned to the Boesen Clinic.

Dr. Mary Davis, senior medical director and vice-president of Wellmark, also testified at trial. Among Dr. Davis' duties at Wellmark is working with providers and acting as chair to the Peer Review Committee, a group of actively practicing physicians in Iowa who review records when a quality of care concern is brought to light. Dr. Davis testified that in 2001, Wellmark became concerned regarding Defendant and his treatment of patients. Dr. Davis conducted a review of file information for a period of one year for each of Defendant's patients. Dr. Davis did not examine the issue from the standpoint of whether Defendant was actually performing the procedures he was claiming but rather, assuming Defendant had in fact performed the procedures he was claiming, whether his actions violated a standard of care. After completing her review, Dr. Davis referred the matter to the Peer Review Committee. The Peer Review Committee ultimately recommended that Defendant be terminated from his preferred provider contract with Wellmark. This decision was ratified by the Peer Review Council. Defendant was sent a notification on December 20, 2002, that indicated his contract was going to be terminated.[6] Wellmark indicated in this notification that the Peer Review Committee had concluded that with respect to the nasal endoscopy with debridement (CPT 31237) procedure, the number of procedures Defendant performed on individual covered persons "demonstrated a consistent pattern of over-utilization and varies from current standards of care." Dr. Davis testified that their concern was that there was a pattern of care Defendant was performing that did not appear to be justified by the diagnosis or the symptomatology presented by the patients in all cases.

Dr. Davis testified that Defendant appealed this decision and ultimately reached an agreement with Wellmark regarding a set of standards and requirements Defendant agreed to observe in order to continue his participation in Wellmark's plan. Dr. Davis testified, and the evidence shows, Defendant agreed on June 13, 2003, that for patients who have had sinus surgery recently who have three nasal endoscopies with debridement, Wellmark would not be reviewing Defendant's records; however, if Defendant wanted to do more than three nasal endoscopies with debridements on a patient, there was a set of agreed-upon diagnoses and evidence, laboratory evidence, and other documentation and notification required before Wellmark would cover the procedures; and if Defendant wanted to do more than six nasal endoscopies with debridements on any patient, a second opinion was required before any other nasal endoscopy services would be provided.[7] Once Defendant signed this agreement, Wellmark allowed him to return to his status as a participating provider, and Dr. Boesen has been participating at least until the verdict in this case.

Dr. Bruce Steffens, Senior Vice–President and Chief Medical Officer of United Health Care of the River Valley,[8] testified

---

6. Trial Exhibit No. 1–19.

7. Trial Exhibit No. 1–21.

8. Formerly known as John Deere Health.

that one of his responsibilities was oversight of utilization management, which refers to how many medical procedures are done, how often they are done, to whom they are done, and whether they are done appropriately and are medically necessary. Dr. Steffens testified that Defendant was a participating physician with John Deere Health, and that in the fall of 2001, John Deere Health began reviewing Defendant's use of the nasal endoscopy with debridement procedure. Dr. Steffens testified that this review began due to a concern regarding the frequency of the nasal endoscopy with debridement procedure being performed and the number of repeat procedures being performed on individual patients. Dr. Steffens testified that once John Deere Health obtained and reviewed Defendant's patient files, concerns remained regarding how many procedures had been performed and the frequency with which they were performed. The audit findings were then reviewed with Defendant and his staff, and Defendant subsequently submitted some written information to John Deere Health in November of 2001 attempting to explain and satisfy the quality review committee or the credentialing committee.[9] Dr. Steffens testified that this written information was insufficient to satisfy the concerns of John Deere Health, thus review by the Quality Improvement Committee and a Peer Review Committee followed. The matter was then referred by the Quality Review Committee to the Corporate Credentialing Committee, and upon review of the information, the Corporate Credentialing Committee asked that Defendant be removed as a participating physician from the panel.

On May 6, 2002, Defendant was sent notification from the Corporate Credentialing Committee indicating that he was being removed as a participating physician from the various products that he belonged to as part of the John Deere Health Network.[10] On July 3, 2002, Dr. Steffens sent a letter to Defendant, indicating that he was reversing the termination decision/recommendation from the John Deere Health Corporate Credentialing Committee. This letter indicated that concerns about the frequency of the use of endoscopic sinus surgery persisted, as did concerns about the rote appearance of office notes, and the requirement for a second opinion for all endoscopic sinus surgery procedures was therefore left in place.[11] Dr. Steffens testified that this requirement for a second opinion meant that another physician, qualified to perform the nasal endoscopy with debridement procedure, would be expected to validate the medical necessity of *any* nasal endoscopy with debridement procedure before John Deere Health would pay for it. After this reinstatement, Defendant declined to remain as a participating physician with John Deere Health and instead sent a letter to John Deere Health dated August 14, 2002, indicating his intention to terminate his participation in John Deere Health's physician provider panels, effective December 31, 2002.[12]

In addition to these witnesses, numerous patients of Defendant testified as a part of the Government's case. Debra McCombs testified that Defendant never used topical anesthetic before sucking "gunk" out of her nose, and that he only spent approximately two to three minutes of time per

9. Trial Exhibit W.

10. Trial Exhibit No. 1–25.

11. Trial Exhibit No. 1–27.

12. Trial Exhibit No. 1–28. The record reflected that Dr. Boesen had few patients who were covered by the United Health Care of the River Valley plan, whereas he had many patients covered by Wellmark.

nostril. Mary Kuhn testified that no surgery was performed on her, and she disagreed with Defendant on her care and decided not to see him anymore. Michelle Mosman testified she did not recall any suction or anything coming out of her nose, there was no bleeding, and the entire procedure took approximately one minute. Mosman testified that she overheard Defendant say to his assistant, "Wait until she gets the bill!", a comment Mosman found upsetting.

Dr. Barbara Evans, an ophthalmologist and a former patient of Defendant's, also testified at trial. Dr. Evans testified that after receiving an explanation of benefits notification from Wellmark regarding what Defendant had billed to Wellmark for a recent office visit of Dr. Evans, she obtained the CPT code that was billed, looked up that code in her CPT code book, and then phoned the Boesen Clinic and ultimately spoke with James Boesen. Dr. Evans explained to James Boesen that there must have been a mistake because she did not have an office surgery done, as essentially all Defendant really did "was suck snot out of my nose." Dr. Evans testified that James Boesen made a comment to the effect of, "well, why would we buy a new piece of equipment if it wasn't to make money." Ultimately, Dr. Evans testified that she decided to transfer her care to a different ENT physician.

Cynthia and Roger Brown both testified at trial regarding the billing they received from the Boesen Clinic for the treatment done to their son, Tyler. The Browns did not believe surgeries were being performed as billed, and Mrs. Brown felt so strongly about the matter she reported Defendant to the fraud unit of Blue Cross and Blue Shield, her insurance provider.

Along with the patient testimony specifically outlined, numerous other patients testified regarding their own office visits with Defendant, how much time it took Defendant to perform any procedures on them, whether anesthetic was used, whether there was bleeding, and whether they experienced any pain or were required by the medical staff to wait after the procedure before being allowed to leave.

"The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Moore,* 108 F.3d 878, 881 (8th Cir.1997) (citing *United States v. White,* 81 F.3d 80, 82 (8th Cir. 1996)). Given the nature of the trial testimony and evidence, the Court concludes the evidence produced at trial was sufficient for a reasonable jury to have found Defendant guilty beyond a reasonable doubt of counts 2 through 52.

***Motion for New Trial.***

■ "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Fed.R.Crim.P. 33. "[T]he district court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and with caution." *United States v. Campos,* 306 F.3d 577, 579 (8th Cir.2002) (quotations omitted). The jury's verdict must be allowed to stand unless the district court ultimately determines that a miscarriage of justice will occur. *See United States v. Lacey,* 219 F.3d 779, 783 (8th Cir.2000).

■ When determining whether a defendant is entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *United States v. Davis,* 103 F.3d 660, 668 (8th Cir.1996); *see also Campos,* 306 F.3d at 579 (citing *White v.*

*Pence,* 961 F.2d 776, 780 (8th Cir.1992)); *Lacey,* 219 F.3d at 783–84.

The Court has highlighted the general nature of the evidence in the Government's case, *supra.* The Defendant's evidence is also considered at this juncture.

Defendant called numerous physicians, some current patients, and a few other witnesses to testify in his defense. Dr. Carol Frier, an internist, testified that she frequently referred patients to Defendant for treatment. Dr. Frier testified that she was not familiar with Defendant's billing practices and that she had not reviewed any of the patient files that are involved in the case. Dr. Kelly Bast, a family practitioner, testified that he regularly referred patients to Defendant for treatment and that he would receive accurate reports from Defendant regarding the procedures or treatments that Defendant gave to Dr. Bast's referrals. Dr. Bast testified that in describing Defendant's reports as "accurate", he was relying on what Defendant told him he had done to the patient and also on the patients' reporting what Defendant had done. Dr. Bast testified that he was not familiar with Defendant's billing practices. Dr. Joellen Heims, a family practice physician, testified that she frequently refers patients to Defendant and that she never had any concern or question about Defendant's doctoring but admitted she was never in the procedure room with Defendant when he was doing procedures and that she had no knowledge of Defendant's billing practices to insurance companies.

Dr. Susan Kennedy, a family practice physician, testified that she has referred patients to Defendant and that she had never had any question or issue regarding any of the procedures Defendant reported he had done. Dr. Kennedy testified that she had not reviewed any of the medical files of any of the patients involved in this case and that she had no knowledge re-

garding Defendant's billing practices. Dr. Joy Trueblood, a pathologist, testified that Defendant sent specimens to her laboratory and that she has never had any hesitation about referring a patient to Defendant but that she had never been at Defendant's office when he performed a procedure and that she had no knowledge regarding Defendant's billing practices. Dr. Steven Quam, a board certified anesthesiologist, testified that he frequently worked with Defendant and that in the course of this work he had the opportunity to review Defendant's chart notes and dictation notes from procedures, notes which Dr. Quam felt were very thorough. Dr. Quam testified that other than his own personal experience as a patient of Defendant's, he had not observed Defendant performing procedures on patients in his clinic and that he had no knowledge regarding Defendant's billing practices.

Dr. Timothy McCulloch, a board certified otolaryngologist, testified that there could be reasons for performing multiple debridements on chronic sinus patients, although he himself had only done multiple debridements on a patient after the patient had a head and neck surgical procedure. Although called by Defendant to testify as an expert witness, Dr. McCulloch testified that he had not reviewed the medical records of the patient files at issue in this case and that he was not rendering any opinions on specific patients in this case.

Jan Hogan testified that she is a guardian of a woman named Caroline, and she takes Caroline to Defendant to treat some of Caroline's medical issues. Hogan testified that she has never had a concern with anything Defendant has said or done towards either herself or Caroline. Janet Woodruff, a patient of Defendant's for approximately five years, testified that given her experience with Defendant, she felt he

was a very truthful, straightforward physician.

Kori Cannata testified that her entire family is treated by Defendant, and given the treatment Defendant had provided to her and her children over the years, she felt he was a remarkable person. Sherri O'Donnell testified that her family is treated by Defendant, and she believes Defendant to be a very sincere, kind, honorable man.

Father Dave Santoro, a priest with Defendant's church, testified he believes Defendant is a person of the highest honor and honesty and integrity. Fern Perry, a receptionist at the Boesen Clinic, testified that at times some waiting occurs at the Boesen Clinic because Defendant spends a lot of time with his patients answering questions. Defendant's father, James Boesen, Sr., testified about his son's character and dedication to his role as a physician.

Defendant took the stand to testify in his defense. Defendant testified that he performed all of the procedures reflected in his chart notes and provided testimony regarding the DVD exhibits that depict him performing the procedures at issue in this case. Defendant flatly denied committing health care fraud or conspiracy to commit health care fraud.

"It is the sole province of the jury to weigh the credibility of a witness." *United States v. Martinez*, 958 F.2d 217, 218 (8th Cir.1992). A review of the trial evidence and the testimony of Dr. Kidder, Dr. McCulloch, Dr. Paulson, Kim Pollock, Agent Kohler, Defendant, and that of all of the other witnesses, provides no reason to second-guess the jury's credibility determinations or the weight the jury gave to certain evidence. As the Court noted above regarding Defendant's Motion for Judgment of Acquittal regarding counts 2 through 52, there was legally sufficient evidence presented at trial to support the conviction on the specific health care fraud offenses. Although that conclusion was reached viewing the evidence in the light most favorable to the guilty verdict and giving the Government all reasonable inferences that may be drawn from the evidence, even applying the less restrictive standard required for a motion for a new trial, the Court finds that there was legally sufficient evidence to support a reasonable verdict by the jury, and a new trial is not required for Defendant on the ground that the verdict is against the weight of the evidence.

### Alleged Prosecutorial Misconduct.

Defendant also argues he is entitled to a new trial because of the alleged misconduct of Assistant United States Attorney Stephen O'Meara, both during the examination of certain witnesses and during the rebuttal portion of closing arguments.

In support of his allegations that prosecutorial misconduct occurred, Defendant first argues that AUSA O'Meara's statement to the jury during the rebuttal portion of the Government's closing argument in which he referenced an "honesty of your gut", incurably deprived Defendant of a fair trial. The statement to which Defendant refers in its entirety was as follows:

The judge is going to ask you to hesitate and deliberate. Everyone here, the defendants and the government, are interested in you to hesitate and to deliberate. The point is not that that's what the hesitation instruction is talking about. This is like one of the most important decisions in your life, both from the standpoint of the defense and the standpoint of the government. But you have to take an action when you're making an important decision in your life. If you reach the point that you feel in the honesty of your gut that you can go ahead and take that action, that's beyond reasonable doubt. The govern-

ment believes that considering all of the evidence that you have received, that having given due and careful deliberations in the interest of all of the people concerned about this case, you can reach in your gut that honest feeling that Jim Boesen and Peter Boesen are guilty of these crimes as charged. If you reach that honest feeling in your gut, you should convict these defendants. Thank you.

Defendant argues that no real curative instruction or admonishment of AUSA O'Meara took place following defense counsel's objection to this remark and that the objection was not formally sustained, and the jury was easily left with the impression that AUSA O'Meara's remarks were a correct interpretation of the law. While true that no objection was sustained and no cautionary instruction given the jury, in fact a contemporaneous objection to AUSA O'Meara's statement was not made in the presence of the jury but instead defense counsel waited until after the jury had already been excused to commence their deliberations before making an objection to this remark; thus the Court had no opportunity to address this issue prior to the jury commencing its deliberations. "[I]f the defendant has an objection, there is an obligation to call the matter to the court's attention so the trial judge will have an opportunity to remedy the situation." *Estelle v. Williams,* 425 U.S. 501, 509 n. 3, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Due to defense counsel's failure to make a contemporaneous objection, the Court was not provided an opportunity to give a curative instruction, sustain the objection in front of the jury, or provide any of the other relief Defendant complains was not provided.

■ "[P]rosecutors would be well advised to avoid trying to explain to the jury the meaning of 'beyond a reasonable doubt'." *United States v. Drew,* 894 F.2d 965, 969 (8th Cir.1990). For purposes of the current motion, AUSA O'Meara's "honesty in your gut" statement will be assumed to be a misstatement of the law, as clearly, the beyond a reasonable doubt standard is based on more than gut reactions or feelings. "[E]ven if the prosecutor misstates the law, such an error is harmless where, as here, the trial court properly instructed the jury to consider only the evidence, and further advised that statements and arguments of counsel are not evidence." *Girtman v. Lockhart,* 942 F.2d 468, 474 (8th Cir.1991) (quoting *United States v. Yancy,* 688 F.2d 70, 72 (8th Cir.1982)) (quotations omitted); *Lingar v. Bowersox,* 176 F.3d 453, 460 (8th Cir.1999) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence."); *see also United States v. Sanchez–Garcia,* 150 Fed.Appx. 909, 918 (10th Cir.2005) (reviewing for plain error the prosecutor's comment that defendant "doesn't get the benefit of the doubt", the court found the comment constituted plain error, but was not so egregious such that it caused a miscarriage of justice); *United States v. Gonzalez–Gonzalez,* 136 F.3d 6, 10 (1st Cir.1998) (during closing argument, prosecutor told jury that if in their mind and in their heart they felt the defendant was a member of the illegal organization, they should say so with their verdict; on review for plain error, appellate court found jury was not lead astray by this comment because the trial court had properly instructed the jury regarding what constituted "reasonable doubt" and directed the jury to disregard statements about the law from counsel); *Griffin v. Delo,* 33 F.3d 895, 906 (8th Cir.1994) (on review of habeas appeal, agreeing with the district court that the state prosecutor's erroneous definition of reasonable doubt did not rise to the level of a constitutional violation where

the trial court had correctly defined reasonable doubt in the jury instructions); *United States v. Alex Janows & Co.*, 2 F.3d 716, 723 (7th Cir.1993) (finding error harmless where prosecutor attempted in his closing argument to define "beyond a reasonable doubt" for the jury).

The Court had previously read to the jury Model Instruction 3.11, and the jury was previously instructed by the Court that the opening and closing statements of counsel did not constitute evidence.[13] AUSA O'Meara himself read Eighth Circuit Model Jury Instruction 3.11, entitled "Reasonable Doubt", which the Court had utilized, to the jury immediately prior to the "honest feeling in your gut" statement. Juries are presumed to follow their instructions, *Zafiro v. United States*, 506 U.S. 534, 540–541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Underdahl v. Carlson*, 462 F.3d 796, 801 (8th Cir.2006), and other than speculation, there is nothing in the record to indicate the jury did not follow the Court's instructions in reaching their verdict. The Court concludes the remark of AUSA O'Meara in which he referenced an "honest feeling in your gut" was not so prejudicial as to deny the Defendant a fair trial.

■ Second, Defendant argues AUSA O'Meara blatantly misrepresented the testimony of Kim Pollack, citing to the following portion of the Government's rebuttal made during closing arguments:

AUSA O'Meara: Just a side note on Zupko. You've a couple of times in closing arguments been invited to believe that what Kim Pollock from Zupko was talking about when she made the statement that they were concerned about the criminality of what she had seen, which, by the way, was in response to a question by Mr. Cook, not from the government—

Mr. Cook: Objection, Your Honor. That's not correct, and the statement of criminality was never said by the witness.

The Court: Stop. The jury will use their own memory to recall what the evidence was.

AUSA O'Meara: Do you really believe that is what Kim Pollock was referring to was that Zupko had done something criminal? As the judge has said, you remember what was said here. But, please, is that what Kim Pollock was talking about, or is it patently clear that what she was talking about was the criminality of Peter Boesen and James Boesen, James Boesen being the person with whom she was dealing?

The testimony to which AUSA O'Meara was referencing took place during AUSA Luxa's redirect of Pollock. Specifically, the relevant portion of the testimony was as follows:

AUSA Luxa: And why didn't you keep the documents that the Boesen firm had sent you?

Pollock: Because we felt they were fairly incriminating and we decided as— the firm decided, not me, the firm

---

**13.** The Court referenced the beyond a reasonable doubt standard some 10 times during the Preliminary Instructions to the jury, in addition to specifically defining reasonable doubt for the jury at the beginning of the trial. The concept was referenced 13 times in the Final Jury Instructions, as well as specifically defined. Preliminary Instruction No. 8 and Final Jury Instruction No. 3 advised that statements by the lawyers are not evidence. Each juror was given a copy of the final instructions to read along with the Court as the Court instructed the jury at the conclusion of the trial and had those written instructions available to them in the jury room. Final Instruction Nos. 1 and 2 specifically advised the jurors that they must follow the Court's instructions on the law.

decided not to keep documents—keep those documents, but to send them back to the practice.

To appreciate the significance of this rebuttal statement to the jury, the Court considers the normal use of the relevant terms. The word "incriminating" is defined as "demonstrating or indicating involvement in criminal activity." *Black's Law Dictionary* (8th ed.2004). Thus, for AUSA O'Meara to paraphrase Pollock's testimony and use the term "criminality" instead of "incriminating" is of no material consequence. Further, it is irrelevant whether this testimony was provided on direct or cross-examination. The Court finds Defendant is not entitled to a new trial based on AUSA O'Meara's comments regarding Pollock's testimony.

Third, Defendant asserts that AUSA O'Meara's examination of Steve Irwin, a Boesen Clinic employee, regarding Iowa Workforce Development documents was improper. AUSA O'Meara conducted the following questioning of Irwin regarding documents from Iowa Workforce Development:

AUSA O'Meara: Do you have any idea whether or not his income from the clinic went down after approximately 2001?

Irwin: I don't know about that.

AUSA O'Meara: If the work force numbers show that between 2001 descending almost annually to 2005 that his income from the clinic went down by almost a million dollars, would you—

Mr. Cook: Your Honor, I object to that. This is irrelevant and immaterial.

The Court: Sustained.

Defendant's objection grounded in relevancy and materiality was sustained by the Court, in the presence of the jury. No cautionary instruction was requested, and the Court did not find this passing reference to support a cautionary instruction *sua sponte.* Defendant's argument on this point fails to establish any prejudice suffered through this limited testimony, which was the subject of an objection that was immediately sustained by the Court. The Court concludes Defendant is not entitled to a new trial based on this very limited questioning.

■ Fourth, Defendant asserts AUSA O'Meara's possession of Iowa Workforce Development records regarding Defendant's income is illegal, and the Government is not exempted from Iowa Code § 96.11(6)(g). Iowa Code § 96.11(6)(g), which pertains to the confidentiality of Iowa Workforce Development records, specifically states as follows:

Information subject to the confidentiality of this subsection shall not be directly released to any authorized agency unless an attempt is made to provide written notification to the individual involved. Information released in accordance with criminal investigations by a law enforcement agency of this state, another state, or the federal government is exempt from this requirement.

Iowa Code § 96.11(6)(g). The Government argues that even though there may be no explicit exception for federal law enforcement agencies to obtain these records, as there is for county attorneys in Iowa Code § 96.11(6)(b)(3), the language contained in Iowa Code § 96.11(6)(g), which references the federal government, demonstrates the Iowa legislature clearly contemplated such information would be disclosed during a federal criminal investigation.

There is an absence of state case law interpreting Iowa Code § 96.11(6)(g). "Whether interpreting federal or state law, a federal court's analysis of a statute must begin with the plain language." *In re M & S Grading, Inc.,* 457 F.3d 898, 901 (8th Cir.2006).

[A] court's primary objective is to ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary and commonly understood meaning. Consideration should also be given to the context of the statutes and the purposes for which they were enacted.

*Johnson v. Methorst,* 110 F.3d 1313, 1315 (8th 1997). "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Boisdore's Heirs,* 49 U.S. 113, 122, 8 How. 113, 12 L.Ed. 1009 (1850); *see also U.S. Nat. Bank of Oregon v. Independent Ins. Agents,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993).[14]

Where the Iowa legislature specifically allows county prosecutors to obtain Iowa Workforce Development records during a state or local criminal investigation, although not expressly stated, it is a rational extension for federal prosecutors to be able to obtain the same information during the course of a federal criminal investigation, as such a construction advances the purpose of aiding law enforcement in their criminal investigations. Indeed, Defendant has articulated no rationale why county prosecutors would be able to obtain this information during the course of a state or local criminal investigation, yet a federal prosecutor would be precluded from obtaining the same information for the same purposes for a federal criminal investigation.

The statute is to be read as a whole and courts are to avoid a statutory construction that would render another part of the same statute superfluous. *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991); *United States v. Gomez–Hernandez,* 300 F.3d 974, 979 (8th Cir.2002). Section 96.11(6)(g) specifically exempts the notification requirement for information released in accordance with criminal investigations by a law enforcement agency of the *federal* government; such an exemption would be unnecessary had the legislature not contemplated that such information could be obtained by a federal law enforcement agency.

This record does not support a conclusion that the Government engaged in prosecutorial misconduct in obtaining the Iowa Workforce Development information. For that reason, and because of the incidental fashion in which this issue arose before the jury, the Court concludes Defendant is not entitled to a new trial on this ground.

■ Fifth, Defendant argues the Government was improperly given two closing arguments, claiming AUSA Luxa's closing argument lasted approximately 45 minutes, and AUSA O'Meara's rebuttal lasted approximately one hour. The clerk's court minutes indicate the Government's closing argument was 50 minutes long, Defense counsel Cook's closing argument lasted 50 minutes, Defense counsel Weinhardt's closing argument lasted one hour and fifteen minutes, and the Government's rebuttal lasted forty-five minutes. Fed.R.Crim.P. 29.1 provides the Government with the opportunity for a rebuttal, no time limitation on rebuttal exists in Rule 29. 1, and Defendant cites to no caselaw to support his assertion he is entitled to a new trial based on the length of time of the Government's rebuttal. In the context of this case, the Court finds no inherent unfairness in the relative length of arguments. Defendant is not entitled to a new trial on this ground.

---

14. Although not central to the Court's determination on this issue, the record reflects no legal issue presented by the state agency when complying with the United States Attorney's request for this information.

### Conspiracy Evidence.

Defendant next argues the interests of justice dictate that he is entitled to a new trial free from the unduly prejudicial evidence related to the conspiracy charge, specifically, the statements of James Boesen. The Government asserts that Defendant failed to make any Rule 801(d)(2)(E) objections at any point during the trial and that the law is clear that acquittal of a coconspirator does not retroactively make co-conspirator statements inadmissible.

■ It is correct Defendant did not make any Rule 801(d)(2)(E) objections during trial, thus not requiring ultimate determinations by the Court regarding the admissibility of the evidence. Even if he had, Federal Rule of Evidence 801(d)(2)(E) allows the admission of "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). "Under this rule, the government must prove, by a preponderance of the evidence, that a conspiracy existed, that the defendant and declarant were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy." *United States v. Williams,* 87 F.3d 249, 253 (8th Cir.1996). This lower burden of proof was satisfied in this case, given the close nature of the working relationship between Defendant and co-defendant James Boesen, the discussions that occurred between the two defendants pertaining to coding and billing procedures, and the timing of James Boesen's statements at issue, all of which occurred during the time period of the conspiracy charged. "[O]nce the court has determined that the Government has made the requisite showing of a conspiracy, the admission of testimony under the co-conspirator exception to the hearsay rule is not rendered retroactively improper by subsequent acquittal of the alleged co-conspirator." *United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir.1983) (quoting *United States v. Cravero,* 545 F.2d 406, 419 (5th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977)) (quotations omitted); *see also United States v. Hernandez–Miranda,* 78 F.3d 512, 513 (11th Cir.1996) (same); *United States v. Carroll,* 860 F.2d 500, 506 (1st Cir.1988) (same). The Court concludes the admission of co-conspirator statements was proper, and Defendant is not entitled to a new trial on this basis.[15]

### Summary Charts.

Defendant argues the admission of Special Agent Kevin Kohler's summary charts deprived him of a fair trial, asserting the information contained within the charts was not relevant in relation to counts 2 through 83, had little probative value to the conspiracy charge, and constituted undue prejudice by including all of the overt act procedures. The Government asserts the summary charts fairly summarized the claims evidence from each of the insurance companies as to each patient, assisted the jury in understanding Dr. Kidder's testimony and the testimony of the insurance company witnesses, and Agent Kohler was subjected to lengthy cross-examination regarding his preparation of the charts.

15. The Government's burden in admitting statements under Rule 801(d)(2)(E) is subject only to a preponderance of the evidence standard. The Court's ruling that the Government had not proved its case against James Boesen was based on the stricter beyond a reasonable doubt standard, therefore based upon these differing standards, concluding that the Government met its burden under Rule 801(d)(2)(E) is not inconsistent with the Court's ruling that ultimately the Government had not proved the case against James Boesen. The Court does not address whether the statements of James Boesen may have been admissible on some other legal basis.

██ "The admissibility of summary charts, graphs, and exhibits rests within the sound discretion of the trial judge". *United States v. Green*, 428 F.3d 1131, 1134 (8th Cir.2005) (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980)) (quotations omitted).

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. "Summary evidence is properly admitted when (1) the charts fairly summarize voluminous trial evidence; (2) they assist the jury in understanding the testimony already introduced; and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary." *Green*, 428 F.3d at 1134 (quoting *King*, 616 F.2d at 1041) (quotations omitted). This case involved numerous charges of health care fraud with respect to various patients and various health insurance companies. In addition to the charges contained in counts 2 through 83, the jury had to consider the overt acts in relation to the conspiracy charge. Each alleged act of health care fraud, whether charged as an overt act or specifically charged in a separate count, had voluminous documentation evidencing such act. The Court finds the summary charts fairly depict this voluminous documentation. Summary charts in such an instance are extremely useful to the jury, and Agent Kohler was subjected to the necessary cross-examination regarding these charts and any inherent inaccuracies or underlying assumptions. The admission of Agent's Kohler's summary charts did not deprive Defendant of his right to a fair trial.

### Procedure DVDs.

██ Defendant argues he is entitled to a new trial because he was deprived of his right to cross-examine his accusers with the DVDs of the procedures at issue. Throughout the course of the Government's case-in-chief, Defendant attempted to offer into evidence as exhibits three DVDs that depicted Defendant administering the procedures at issue. These DVDs were made after the indictment was filed and were prepared for use at trial. Each time Defendant offered these DVDs into evidence, the Court sustained the Government's objection to their admission, finding that to allow the DVDs into evidence would essentially permit Defendant to testify regarding the manner in which he performed the procedures at issue in the case without being subject to cross-examination. The Court repeatedly informed defense counsel that if Defendant were to take the stand in his defense, the Court's ruling would change and the DVDs would then be admitted into evidence, as the requisite cross-examination would be available to the Government.

Defendant did decide to testify in his defense and subsequently the DVDs were offered and admitted into evidence during the course of Defendant's testimony. At any time after these DVDs were allowed into evidence, Defendant could have recalled any of the witnesses he wished to cross-examine about these DVDs, yet Defendant elected not to do so. Defendant was not deprived of his right to effectively cross-examine any witness based on any action of the Court. Defendant's trial strategy in not recalling these witnesses is not an error of the Court that impacted the fairness of Defendant's trial.

### Counts 65–67.

Defendant argues Dr. Kidder provided no testimony, and the Government presented no evidence, that Defendant per-

formed any CPT 69150s on Lisa Lovejoy, the patient incorrectly identified on the verdict forms as the patient to whom counts 65 through 67 pertained. The Government asserts that the evidence clearly showed that counts 29 through 31 referred to patient Lisa Lovejoy for the nasal endoscopy with debridement procedure (CPT 31237), and counts 65 through 67 referred to patient Leona Larsen for the cholesteatoma procedure (CPT 69150). The Government maintains that while the verdict forms may have incorrectly listed the wrong patient for counts 65 through 67, the jury certainly had ample evidence demonstrating Defendant's guilt as to the counts involving Leona Larsen.

Counts 65 through 67 as charged in the superseding indictment listed Leona Larsen, and not Lisa Lovejoy, as the relevant patient for those counts. Lisa Lovejoy was a sinus patient; Leona Larsen was a cholesteatoma patient. There was no evidence presented that any cholesteatoma procedures (CPT 69150) were performed on Ms. Lovejoy, and clearly the listing of Lisa Lovejoy on the verdict form for counts 65 through 67 was a scrivener's error.

Counsel were provided with a copies of the final jury instructions, along with the lengthy verdict form, for inspection prior to making formal objections; and the Court specifically advised counsel for all parties to carefully review the verdict forms, given the various procedures, health care providers, and patients that were at issue in each individual count. Neither the Government nor the Defendant pointed out the error with respect to counts 65 through 67 to the Court at any time prior to the filing of the instant motion, and neither party objected to the verdict forms at the time of lodging formal objections to the final jury instructions and verdict forms.

■ "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed.R.Crim.P. 52(b). Under the plain error review, discretion should be exercised "to correct only errors serious enough to affect the fairness, integrity or public reputation of judicial proceedings, such as circumstances in which a miscarriage of justice would otherwise result." *United States v. Harper*, 466 F.3d 634, 644 (8th Cir.2006) (quoting *United States v. Olano*, 507 U.S. 725, 735–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)) (quotations omitted); *see also United States v. Smith*, 2006 WL 3702656, *1 (D.Minn.2006) (in the absence of a contemporaneous objection, district court reviews alleged error under the plain error standard).

■ A conviction on counts 65 through 67, where the verdict forms incorrectly identify a patient, on which there is no allegation that Defendant committed the crime of health care fraud with respect to a cholesteatoma removal on this patient, affects the integrity and public reputation of these judicial proceedings. The Court has concluded Defendant is not entitled to a judgment of acquittal on these counts, as evidence regarding the correct patient at issue, Leona Larsen, exists and was presented at trial. Defendant is, however, entitled to a new trial on counts 65 through 67, because to decide otherwise would be inconsistent with the fairness, integrity, and public reputation of these judicial proceedings.

### Jury Deliberations.

Defendant argues that the jury's verdict for counts 65 through 67 demonstrates that the jury did not carefully read the verdict forms and that the jury conducted no meaningful, independent deliberations as to each count of the indictment as required by the jury instructions, pointing to

the "swiftness" with which the jury deliberated. The clerk's minutes reveal that although the trial spanned a two-week period from June 31, 2006, through the day the verdict was reached, August 7, 2007, the Court was in session with the jury for the presentation of evidence for approximately 41 total hours; the remainder of the court days were spent in proceedings with counsel outside the presence of the jury, or for recesses. The clerk's minutes also reveal the jury deliberated for almost nine hours.

▮ "[T]here is no clear rule as to the proper amount of deliberation time, and the appropriateness of the deliberation time is dependent on the facts of a particular case." *United States v. Aldridge*, 413 F.3d 829, 833 (8th Cir.2005); *see also United States v. Dolan*, 120 F.3d 856, 870 (8th Cir.1997) (no rule requiring a jury to deliberate for a specific length of time). While this case involved voluminous exhibits and testimony from numerous witnesses, much of the witness testimony was cumulative, and the factual issues involved were not complex. Each juror entered the jury room to commence deliberations with a grasp of the evidence and perceptions formed during the course of the trial that did not have to be developed out of whole cloth simply because the commencement of deliberations was the first time the jurors could discuss the case or view all of the exhibits more closely. This record does not support a conclusion that no reasonable jury could have considered separately whether each Defendant was guilty of conspiracy and whether each Defendant was guilty of the 82 separate counts of health care fraud within nine hours.[16]

### *Motion for Forfeiture of Property.*

▮ Count 84 of the superseding indictment seeks forfeiture of the proceeds of Defendant's health care fraud, pursuant to 18 U.S.C. § 982(a)(7), which provides as follows:

> The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

18 U.S.C. § 982(a)(7).

> As soon as practicable after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay. The court's determination may be based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt.

Fed. R.Crim. Pro. 32.2(b)(1). This preliminary order of forfeiture becomes final at sentencing and must be made part of De-

---

**16.** While Defendant argues the jury did not conduct meaningful deliberations, and the specifics of their deliberations are properly beyond our reach, the Court notes that with regard to count one, the jury did not find the defendants guilty of the same overt acts. Upon examination of the overt acts, the jury did not find beyond a reasonable doubt as to each defendant, it is clear the jury read the jury instructions and engaged in significant consideration during the course of their deliberations.

fendant's sentence and included in the judgment. Fed. R.Crim. Pro. 32.2(b)(3). The preponderance of the evidence standard governs criminal forfeiture proceedings, and the burden is on the Government. *United States v. Wojcik,* 60 F.3d 431, 434 (8th Cir.1995); *United States v. Bieri,* 21 F.3d 819, 822 (8th Cir.1994).

The Government argues that Defendant was convicted of a scheme to defraud and that each of the claims listed in the substantive counts of the superseding indictment, counts 2 through 83, are a separate execution of that scheme. The Government further argues the health care fraud statute criminalizes a scheme to defraud, and while each substantive count may be a separate execution of that scheme, the Government is entitled to forfeit the proceeds of Defendant's entire scheme to defraud including uncharged executions of that scheme. The Government asserts that while it had the authority, it did not charge 948 other executions of the scheme (detailed in count one as overt acts), because to do so would have required an indictment containing over 900 counts. The Government states the trial evidence demonstrated Defendant billed for medical procedures not actually performed on patients and that the procedures billed were more expensive than those actually performed on the patients. The Government seeks a preliminary order of forfeiture in the form of a money judgment against Defendant in the amount of $428,971.00, an amount the Government contends constitutes the total amount of the gross proceeds from Defendant's scheme to commit health care fraud. This amount includes the 948 claims not specifically charged in substantive counts as separate executions of the scheme.

Defendant argues that the amount of forfeiture is limited to the proceeds specifically traceable to the commission of the offenses for which he was convicted and therefore the 948 claims for reimbursement detailed in count one, but not specifically charged in substantive counts as executions of the overall scheme, are irrelevant in determining the forfeiture amount. Defendant asserts that per Agent Kohler's summary charts, the total amount of the proceeds received and traceable for the commission of the 82 substantive counts is $52,157.59, noting that this figure includes the three cholesteatoma procedures (CPT 69150) billed to Medicare as alleged in counts 65 through 67.

Clearly, the amounts received by the Boesen Clinic for the procedures at issue in counts 2 through 64 and counts 68 through 83 should be included in the forfeiture amount. The issue the Court must determine is whether any additional executions of the scheme not specifically charged as substantive counts, but which fall within the boundaries of the overall scheme, can be included in determining the proper forfeiture amount.

 The federal health care fraud statute punishes anyone who

knowingly and willfully executes, or attempts to execute, a scheme or artifice ... to defraud any health care benefit program, or ... obtain[s], by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items or services ...

18 U.S.C. § 1347. The law does not require the Government to charge a defendant with every execution of a health care fraud scheme, and the Government could indict a defendant for a health care fraud scheme by charging only one execution of that scheme. *United States v. Kirkham,* 129 Fed.Appx. 61, 68 (5th Cir.2005) ("[A]lthough the government may charge defen-

dants for each execution of the scheme, it is not required to do so."); *United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003) ("[A]lthough the crime of health care fraud is complete upon the execution of a scheme, any scheme can be executed a number of times, and each execution may be charged as a separate count."). Other courts, in examining the bank fraud statute codified at 18 U.S.C. § 1344 and containing statutory language virtually identical to the health fraud statute, have found the same. *United States v. Pless*, 79 F.3d 1217, 1220 (D.C.Cir.1996) ("[I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme."); *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir.1992) ("[F]or each count of conviction, there must be an execution. However, the law does not require the converse: each execution need not give rise to a charge in the indictment.").

Each execution does constitute a separate offense, and the Government could in fact have charged Defendant with the hundreds of other executions of the health care fraud scheme.[17] Instead, the Government chose to set forth the scheme in the indictment and specifically charge only 82 separate executions of the overall scheme. The statute criminalizes executions of the scheme; the overall scheme is thus inherently part of the offenses of which Defendant has been convicted. "Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct." *United States v. Ursery*, 518 U.S. 267, 284, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). Forfeiture of the gross proceeds of uncharged executions of the scheme that Defendant was convicted of serves this purpose. The Court will therefore include in the forfeiture amount the gross proceeds from the overall scheme charged in the indictment.

Defendant also argues he is entitled to some amount of reimbursement or set-off for the procedures he actually did perform, essentially arguing that he should only be held responsible for the excess charges underlying his health care fraud, and not for charges for services actually performed. Defendant contends the evidence shows that at a minimum, he was performing a diagnostic nasal endoscopy procedure (CPT 31231) on each of the patients at issue, the amount of reimbursement he would have received for billing such a procedure was $150.00, he is entitled to a set-off of $150.00 for each of the sinus procedures the Court includes in its forfeiture ruling, and thus with respect to counts 2 through 52, the amount of forfeiture should be reduced by a total amount of $7,650.00. Applying this same argument to the cholesteatoma patients, Defendant argues the undisputed evidence was that he should have coded these procedures as the removal of ear canal lesions (CPT 69145), the amount of reimbursement he would have received for billing such a procedure was $197.00, he is entitled to a set-off of $197.00 for each of the cholesteatoma procedures included in the forfeiture ruling, thus with respect to counts 53 through 76, the amount of forfeiture should be reduced by $4,728.00.

Defendant has cited no authority in support of his assertion that in determining the proper forfeiture amount he is entitled to a set-off for the procedures he actually did perform, though the argument has some initial logical appeal. Other courts have rejected similar arguments when

---

**17.** If the indictment had charged Defendant with each execution of the scheme in a separate count, at $100 per count, Defendant would also have been exposed to a potential special assessment of over $100,000. 18 U.S.C. § 3013(a)(2)(A).

evaluating forfeiture pursuant to 21 U.S.C. § 853, which includes statutory language subjecting "*any* proceeds" to forfeiture. *United States v. Keeling*, 235 F.3d 533, 537 (10th Cir.2000) (concluding "proceeds" as used in 21 U.S.C. § 853 contemplates *gross* proceeds, and not merely profits); *United States v. McHan*, 101 F.3d 1027, 1042 (4th Cir.1996) ("The proper measure of criminal responsibility generally is the harm that the defendant caused, not the net gain that he realized from his conduct."). The relevant forfeiture statute for purposes of this case, 18 U.S.C. § 982(a)(7), specifically states *gross* proceeds shall be forfeited. The amounts received by the Boesen Clinic from the overall scheme and included in Agent Kohler's summary charts pertain solely to the procedures at issue; the dollar amounts do not include any office visits or any other charges incurred during the course of the office visit.

The statute specifically states that *gross* proceeds "traceable to the commission of the offense" shall be forfeited. The offense was the submission of fraudulent claims under a specific code that called for a payment in a specific amount. Given the express language of the statute and the foregoing additional legal authority, this Court concludes it is irrelevant that Dr. Boesen could have legitimately charged a lesser amount for a different procedure, identified by a different code. To allow

the perpetrator of a fraud to mitigate his eventual forfeiture exposure by such a set-off procedure would seem fundamentally inconsistent with the purpose of the statute and challenging, if not impossible, in its application from case to case.

■ Based upon the specific language of the forfeiture statute, the precise nature of the offense of conviction, and the lack of authority to support the concept that Defendant is entitled to a set-off for whatever procedures he actually performed on his patients, the Court will not include any set-off in its determination of the proper forfeiture amount.[18]

Agent Kohler testified at trial that the total dollar amount Defendant's clinic received from the insurance companies for the procedures listed in the summary chart exhibits was $428,971.00. The Court has previously concluded that Defendant is entitled to a new trial on counts 65 through 67, thus the amount Defendant received for these procedures, $3,101.94,[19] cannot be included in this forfeiture determination. Using the total amount of $428,971.00 gleaned from the summary charts and Agent Kohler's testimony regarding those charts, and subtracting from that amount the $3,101.94 that pertains to counts 65 through 67, the Court has calculated the gross proceeds from the offense conduct to be $425,869.06. This amount represents the gross proceeds traceable to

18. Both parties argued at the hearing on the Motion for Preliminary Order of Forfeiture that for United States Sentencing Guidelines purposes, the loss amount and the forfeiture amount are the same. It is well-settled in the law that both uncharged and acquitted conduct, if proven by a preponderance of the evidence, may be used for sentencing purposes. *United States v. No Neck*, 472 F.3d 1048, 1055 (8th Cir.2007) (citing *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir.1998)); *United States v. Valdivia–Perez*, 185 Fed.Appx. 543, 545–544 (8th Cir.2006); *United States v. High Elk*, 442 F.3d 622 (8th Cir.2006); *United*

*States v. White*, 354 F.3d 841, 844 (8th Cir. 2004). The Court does note Defendant's argument regarding set-off appears to have merit in the context of determining for sentencing purposes the proper loss amount pursuant to U.S.S.G. § 2B1.1(b)(1). *United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006) ("[T]he amount of loss is the difference between the amount the defendant actually received and the amount he would have received absent the fraud."); *United States v. Parsons*, 109 F.3d 1002 (4th Cir.1997).

19. Trial Exhibit No. 112–2.

the offenses on which Defendant was convicted, and this amount is subject to forfeiture. The Government's Motion for Preliminary Order of Forfeiture is granted, and Defendant is ordered to forfeit to the Government $425,869.06.

## CONCLUSION

For the above stated reasons, Defendant's Motion for Judgment of Acquittal (Clerk's No. 154) must be **denied.** Defendant's Motion for New Trial (Clerk's No. 154) must be **denied,** except with respect to counts 65 through 67. In the interests of protecting the integrity of the judicial proceedings and the public's faith in such, Defendant's Motion for New Trial as to Counts 65 through 67 must be **granted.** The Government's Motion for Order of Preliminary Forfeiture (Clerk's No. 162) must be **granted,** and the amount of the money judgment against Defendant shall be $425,869.06.

**IT IS SO ORDERED.**