06-0669-cr
U.S. v. Capoccia

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: March 29, 2007)                    Decided: September 19, 2007)

Docket No. 06-0669-cr

———————————————————————

UNITED STATES OF AMERICA,

*Appellee.*

– v. –

ANDREW CAPOCCIA,

*Defendant-Appellant,*

THOMAS DALE, CAROL CAPOCCIA, CARLO SPANO,

*Defendants.*

———————————————————————

Before SOTOMAYOR and KATZMANN, *Circuit Judges*,
and GERTNER, *District Judge*.[*]

———————————————————————

Defendant-appellant Andrew Capoccia appeals from the February 2, 2006 Preliminary Order of Forfeiture of the United States District Court for the District of Vermont (Murtha, J.), which ordered forfeited the contents of several bank accounts and other items in connection with Capoccia's conviction of, among other crimes, interstate transportation of stolen property in violation of 18 U.S.C. § 2314. We hold that the district court did not err under Federal Rule of Criminal Procedure 32.2(b)(1) in basing its forfeiture determination both on the trial record and on evidence adduced at the forfeiture hearing, but that the district court did err in ordering forfeited assets obtained by Capoccia prior to May 24, 2000. These assets were obtained through uncharged violations of § 2314 and did not bear an adequate statutory nexus to the violations of

———————————————

[*] The Honorable Nancy Gertner, United States District Judge for the District of Massachusetts, sitting by designation.

which Capoccia was convicted, as required by 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c), and by Federal Rule of Criminal Procedure 32.2(b)(1).  We AFFIRM the forfeiture order in part, VACATE it in part, and REMAND for further proceedings consistent with this decision.

> JAMES J. GELBER (Gregory L. Waples, David V. Kirby, *on the brief*), Assistant United States Attorneys, *for* Thomas D. Anderson, United States Attorney for the District of Vermont, Burlington, Vermont, *for appellee.*
>
> ELIZABETH L. TANG, Delmar, New York (Thomas A. Zonay, Ford & Zonay, P.C., Woodstock, Vermont, *on the brief*), *for defendant-appellant.*

SOTOMAYOR, *Circuit Judge*:

Defendant-appellant Andrew Capoccia appeals from the February 2, 2006 Preliminary Order of Forfeiture of the United States District Court for the District of Vermont (Murtha, J.),[1] which ordered forfeited the contents of several bank accounts and other items and imposed a money judgment.  The forfeiture was based on Capoccia's conviction, following a jury verdict, of thirteen counts of various crimes in connection with his management of and involvement in certain centers offering debt-reduction services.  We hold that the district court did not err under Federal Rule of Criminal Procedure 32.2(b)(1) in basing its forfeiture determination both on the trial record and on evidence adduced at the forfeiture hearing, but that the district court did err in ordering forfeited assets obtained by Capoccia prior to May 24, 2000.  Count One of the Second Superseding Indictment, which charged Capoccia with interstate transportation of stolen property

---

[1] On August 15, 2006, after Capoccia had filed a notice of appeal of the Preliminary Order of Forfeiture, the district court entered a Final Order of Forfeiture.  Because no claims or petitions asserting third party interests in the forfeited property were filed in the interim between the two orders, the terms of the Final Order of Forfeiture and the Preliminary Order of Forfeiture were materially identical.  Although Capoccia did not file a separate notice of appeal from the Final Order of Forfeiture, we, like the parties, understand the appeal to be from both orders.

in violation of 18 U.S.C. § 2314, did not charge Capoccia with any criminal conduct before that date, and any assets derived from that uncharged conduct did not bear the requisite nexus to the violations of which Capoccia was convicted, as required by the forfeiture provisions 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c) and by Federal Rule of Criminal Procedure 32.2(b)(1). We AFFIRM the forfeiture order in part, VACATE it in part, and REMAND for further proceedings consistent with this decision.

Capoccia has also challenged several other aspects of his conviction and restitution order in a companion case, *United States v. Capoccia*, No. 06-0670. We reject these challenges and affirm his conviction in a summary order also filed today.

## BACKGROUND

### I. Offense Conduct

The following facts are drawn from the Second Superseding Indictment (the "Indictment") and evidence adduced at trial.

In February 1997, Andrew Capoccia, then a licensed lawyer,[2] formed a company called Andrew F. Capoccia, LLC, of which Capoccia was the sole owner. The company changed its name in 1998 to the Andrew F. Capoccia Law Centers, LLC. These entities will be referred to as the "Capoccia Law Centers" or "Law Centers."

The Capoccia Law Centers, which operated in New York, offered a debt reduction program targeted at consumers who had problems paying their unsecured debt, primarily credit card debt. The Law Centers heavily advertised its debt reduction business, claiming that by negotiating collectively with a consumer's creditors, the Law Centers could reduce the

---

[2] Capoccia was disbarred in September 2000.

consumer's debt by as much as 50 percent to 70 percent. Each client enrolling in the program signed a contract specifying his or her total amount of unsecured debt and projecting the total savings the Law Centers would obtain for the client by negotiating with the client's creditors. The contract also estimated the retainer fee (twenty-five percent, and later twenty-eight percent, of the projected total savings) the Law Centers would earn upon settling the client's debts. The client agreed to make monthly payments to the Law Centers to fund the debt reduction program—i.e., the money the Centers would use to settle with creditors—and to pay the retainer fee and account maintenance fees. If the client withdrew, the Law Centers would refund the unearned retainer fees and the debt reduction payments. The Law Centers utilized two principal types of bank accounts. Its operating account was funded by the retainer fee payments, which the Law Centers treated as income immediately upon receipt. The Law Centers' escrow account held the funds to be used to settle clients' debts.

In June 2000, Capoccia, who faced disciplinary proceedings in New York and a civil fraud suit commenced by the New York Attorney General against the Law Centers, entered into an agreement with co-defendants Howard Sinnott and Thomas Daly, employee-attorneys of the Law Centers, to sell the Law Centers' assets. The agreement provided that the Daly, Murphy & Sinnott Law Centers, PLC would purchase the Law Centers' assets for at least $12,000,000 and would pay Capoccia 20 percent of its gross income over a period of ten years. The Daly, Murphy & Sinnott Law Centers, which also underwent name changes, will be referred to, along with its successors, as the "Law Centers for Consumer Protection" or "LCCP." Following the asset purchase, LCCP continued to provide similar debt reduction services to those previously offered by the Capoccia Law Centers. In July 2000, LCCP moved its base of operations from New York

4

to Vermont. Although Capoccia no longer possessed an ownership interest in LCCP after the asset purchase, he remained affiliated with LCCP in an advisory capacity and actively participated in management decisions.

As described in the Indictment, Capoccia and his colleagues at the Law Centers and LCCP committed several types of misconduct with respect to those entities' funds. First, they engaged in the misappropriation of unearned retainer fees by depositing those fees into the firms' general operating accounts and then spending them before settling the client's debts. As a result of this misappropriation, and because the Law Centers experienced continuous and severe financial shortfalls, it regularly failed to pay timely and complete refunds to clients who withdrew from the debt reduction program. Nonetheless, in recruiting clients, the Law Centers continued to represent that withdrawing clients would receive refunds of unearned retainer fees.[3] Following its purchase of the Law Centers' assets, LCCP engaged in similar conduct and, as a result, lacked funds to pay timely refunds to withdrawing clients.

Second, starting in 2000, Capoccia and his colleagues began embezzling client escrow money, which the firm was required to hold on the clients' behalf until the money was used to pay off their debts. Capoccia authorized several transfers of money from the client escrow account into LCCP's payroll and general operating accounts, both directly and to cover overdrafts in the general account. All told, over two million dollars was removed from the client escrow account.

---

[3] The government's theory of guilt on the charges relating to the spending of unearned retainer fees was not that the spending itself was illegal, but rather that Capoccia converted the monies to his use by fraud when he represented to clients that retainer fees would be either earned or returned upon demand, while he knew that, due to the precarious state of the Law Centers' finances, neither would occur for the vast majority of the Law Centers' clients.

Finally, throughout this time period, even as the Law Centers and later LCCP faced serious shortfalls and owed millions of dollars to clients, Capoccia transferred several million dollars from the firms' accounts to accounts controlled by his wife, Carol Capoccia. Capoccia also used the Law Centers' funds to pay his income taxes, make improvements on his home, and purchase jewelry.

In March 2002, federal and state authorities executed search warrants of LCCP's offices. The firm eventually declared bankruptcy.

## II. The Indictment

On March 10, 2003, a federal grand jury in Rutland, Vermont, returned a fifty-count fraud and forfeiture indictment against Capoccia and six of his Law Centers and LCCP colleagues. The same grand jury returned a Superseding Indictment on November 3, 2003, and on September 14, 2004, a different grand jury sitting in Burlington, Vermont returned a Second Superseding Indictment (the "Indictment") against Capoccia and three of his colleagues.[4]

Count One of the Indictment, of principal relevance to this appeal, charged Capoccia with violating 18 U.S.C. § 2314 by transporting in interstate commerce monies he knew to be stolen, converted and taken by fraud. Summarizing the prefatory paragraphs of the Indictment, the count referred to Capoccia's "scheme, between 1997 and 2002, to convert to his own benefit and to the benefit of others unearned retainer fees paid by clients to the Capoccia Law Centers and to LCCP." It then alleged that Capoccia transferred in interstate commerce thirty-one payments, the earliest of which was dated May 24, 2000.

---

[4] The Second Superseding Indictment reflected the fact that one of Capoccia's co-defendants pleaded guilty and the charges against two others were severed.

Count Two charged Capoccia and his co-defendants with conspiracy under 18 U.S.C. § 371, the object of which was to commit violations of § 2314, wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and receipt of stolen property transported interstate in violation of 18 U.S.C. § 2315. The count alleged the conspiracy to commence on or about July 1, 2000, and terminate on or about January 27, 2003. Counts Three through Five, Seven, and Nine through Fifteen charged Capoccia, and in certain instances his co-defendants as well, with substantive violations of those statutes, as well as money laundering in violation of 18 U.S.C. § 1956.[5] Count Nineteen sought forfeiture of "any and all proceeds of the statutory violations specified" in Count One. Counts Twenty through Twenty-three and Twenty-five through Thirty sought forfeiture of the property traceable to the violations alleged in the other substantive counts.

**III. The Trial**

Capoccia's three co-defendants pleaded guilty on the eve of trial, so Capoccia alone proceeded to trial. The government's direct case consisted primarily of testimony by former Law Centers employees. Special Agent Daniel Rachek of the Federal Bureau of Investigations testified about the financial aspects of the Law Centers' conduct, including the flow of money from the Law Centers' and LCCP's accounts to accounts held by Carol Capoccia.

Prior to the testimony of Agent Rachek, the district court held two bench conferences to discuss defense counsel's request to prohibit the prosecution from introducing evidence of conduct before May 24, 2000. In those conferences, defense counsel took the position that the Indictment did not charge Capoccia with any criminal conduct prior to that date, and that the jury

---

[5] The remaining substantive counts charged only Capoccia's co-defendants.

therefore should be instructed to consider evidence of such conduct as background only. The government, by contrast, maintained that the pre-May 2000 conduct was charged by the Indictment and admissible as evidence of a continuing scheme to defraud. Nonetheless, during the second conference, the government offered to agree to the limiting instruction requested by defense counsel during the guilt phase of the trial, so long as the government could seek forfeiture of monies associated with the pre-May 2000 conduct during the forfeiture phase. Defense counsel consented. In light of the parties' agreement, the district court issued the limiting instruction and made no further ruling with respect to the pre-May 2000 conduct.

On April 5, 2005, the jury convicted Capoccia on all counts. Capoccia waived his statutory right to a jury determination of the forfeiture amount.

## IV. Forfeiture Proceeding

Following the jury verdict, the government moved for issuance of a preliminary order of forfeiture based on Counts Nineteen through Twenty-Three and Twenty-Five through Thirty of the Indictment, seeking forfeiture of the assets listed in those counts as well as an additional money judgment to cover untraceable amounts. Capoccia contested the forfeiture, and the district court conducted a forfeiture hearing on December 7, 2005. *See* Fed. R. Crim. P. 32.2(b)(1) (providing for hearing if forfeiture is contested). Agent Rachek, using exhibits prepared for trial, testified to the movement of monies out of the accounts of the Law Centers and LCCP and into various accounts controlled by Capoccia. Agent Rachek ultimately traced those funds into the accounts seized by the government.

On February 2, 2006, the district court granted the government's motion for issuance of a preliminary order of forfeiture. Capoccia had objected, both at the hearing and in his

8

submissions to the court both prior to and after the hearing, that proceeds from pre-May 2000 transfers were not forfeitable because they were not charged in the Indictment and he had not been convicted of them. In the district court's ruling on the government's motion for forfeiture, the court found, without explicitly addressing Capoccia's objection, that proceeds from transfers both before and after May 24, 2000 were forfeitable under Count One. The district court determined that Capoccia caused at least $4,422,966 in total to be wrongfully transferred in connection with his conviction on Count One, of which at least $1,114,770 was transferred prior to May 24, 2000.[6] Because the district court found that the seized assets were insufficient to cover the $4,422,966 wrongfully transferred in connection with Count One, the court awarded the government a money judgment for the remaining amount, $1,463,799. The court performed the same analysis for the other counts of conviction, ultimately finding that all of the seized assets were forfeitable and that the government was entitled to a money judgment in the total amount of $6,247,581 in connection with all of the counts. The Preliminary Order of Forfeiture, issued February 2, 2006, reflected these findings. On August 15, 2006, the district court issued a Final Order of Forfeiture materially identical to the Preliminary Order of Forfeiture.

**DISCUSSION**

**I. Standard of Review**

We review a district court's legal conclusions regarding forfeiture *de novo*. *United States v. Gaskin*, 364 F.3d 438, 461-62 (2d Cir. 2004).

---

[6] Specifically, the district court found that for money taken before May 24, 2000, the sums of $212,871 and $564,982 could be traced to the seized account it labeled "Account 1," and $336,917 could be traced to "Account 2."

## II. Evidence at the Forfeiture Hearing

When the government seeks to impose criminal forfeiture, Federal Rule of Criminal Procedure 32.2(b)(1) (the "Rule") requires the sentencing court to "determine what property is subject to forfeiture under the applicable statute." Under the Rule, the court's forfeiture determination "may be based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt." *Id.* Capoccia argues on appeal that the district court failed to comply with the Rule when it established the forfeitability of the seized assets based not only on evidence adduced at Capoccia's forfeiture hearing, but also on evidence adduced during his trial. Specifically, he contends that the word "or" in the Rule indicates that the district court may base its forfeiture order *either* on evidence in the record, if the forfeiture is uncontested, *or* on "evidence or information presented by the parties at a hearing," if the forfeiture is contested. We disagree.

First, the language of the Rule does not compel the cramped reading Capoccia advocates. The Rule plainly states that district courts "*may*" base their determinations on evidence in the record or on evidence from a hearing. This permissive language suggests that the sentencing court has some latitude with respect to the information on which it bases its forfeiture order. Moreover, Capoccia's interpretation of the Rule would lead to the absurd result that, whenever a defendant contests the amount of forfeiture, the government would be required to reintroduce at a post-trial hearing potentially large portions of its case from the guilt phase of the defendant's trial to a judge or jury that has already seen and considered the relevant evidence. The Rule's drafters could not have intended such an unnecessary and burdensome outcome. *See United States v.*

10

*X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (holding that statutes should be construed to avoid absurd results). The Advisory Committee Notes to Rule 32.2 further confirm our interpretation of the Rule: "The court may make the determination [as to the requisite nexus between assets and criminal violations] based on evidence in the record, or on *additional* evidence submitted by the defendant or evidence submitted by the government in support of the motion for the entry of a judgment of forfeiture." *See* Fed. R. Crim. P. 32.2 advisory committee's note (emphasis added).

Second, this Court has already approved of sentencing courts' consideration of trial evidence in determining forfeiture. *See Gaskin*, 364 F.3d at 462-63 (affirming district court's forfeiture order which relied on evidence adduced at trial, as well as additional evidence introduced post-trial, and concluding after considering all the evidence presented that "ample direct and circumstantial evidence supported" the order), *aff'g* No. 00-6148, 2002 U.S. Dist. LEXIS 28022, at *24, *26 (W.D.N.Y. Jan. 8, 2002) (stating that "[p]ursuant to Rule 32.2(b)(1), where forfeiture is contested, the Court in reaching its decisions may consider not only evidence already in the record, but any additional evidence presented by the parties at a hearing," and concluding "based upon the totality of proof that the Government has established by a preponderance of evidence the requisite nexus" between the offense and the assets to be forfeited).

Finally, in this case, Agent Rachek provided sufficient testimony at the hearing itself to establish the nexus the Rule demands.[7] To the extent Capoccia also objects to Agent Rachek's

---

[7] This conclusion is subject to the qualification discussed below, concerning forfeiture of monies transferred prior to May 24, 2000.

reliance on trial exhibits, either generally or because he believes they are barred as hearsay, neither the Federal Rules of Evidence nor any other rule prohibits the admission of such materials. *See* Fed. R. Evid. 1101(d)(3) (providing that the Rules of Evidence are inapplicable in sentencing proceedings); *Libretti v. United States*, 516 U.S. 29, 38-41 (1995) (holding that forfeiture is part of the sentencing process); *see also* Fed. R. Crim. P. 32.2(b)(1) (stating that additional "information," in addition to evidence, may be taken at hearing); *cf. United States v. Messino*, 382 F.3d 704, 714 (7th Cir. 2004) (rejecting defendant's challenge to forfeiture hearing procedures, which permitted government counsel to "read[] portions of the trial transcript to the jurors").

## II. Forfeiture of Pre-May 2000 Monies

Capoccia's second and principal challenge is to the forfeiture of monies which the district court determined to constitute proceeds of violations of 18 U.S.C. § 2314 occurring prior to May 24, 2000 (the "pre-May 2000 monies"). Capoccia argues that (1) Count One of the Indictment did not allege violations occurring prior to May 2000; (2) if it did allege such violations, he was not convicted of such violations because of the limiting instruction given to the jury; and (3) in light of his failure to be charged with or convicted of the violations, it was improper to order forfeiture of the pre-May 2000 monies. We agree with Capoccia's first argument, and hold that Count One of the Indictment did not charge him with violations prior to May 24, 2000. As a result, we do not consider the effect, if any, of the limiting instruction. Finally, we hold that in the circumstances of this case, where the government has alleged discrete violations of a statute that does not criminalize a scheme, conspiracy, or enterprise, the government is not entitled to forfeiture of proceeds from uncharged violations regardless of whether they and the charged

12

violations are part of a common scheme.

*A. Indictment*

Count One of the Indictment charges Capoccia with violating the first paragraph of 18

U.S.C. § 2314,[8] which provides that:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

Count One, consisting of paragraphs thirty-nine and forty of the Indictment, reads as follows:

> 39.  The grand jury repeats and realleges paragraphs 1-38 of this indictment. Among other things, those paragraphs describe ANDREW CAPOCCIA'S scheme, between 1997 and 2002, to convert to his own benefit and to the benefit of others unearned retainer fees paid by clients to the Capoccia Law Centers and to LCCP.
> 40.  On or about the dates listed below, in the District of Vermont and elsewhere, the defendant
> ANDREW CAPOCCIA
> transmitted and transferred in interstate commerce, from PNC Bank in New Jersey, from Chittenden Bank in Vermont and from First Massachusetts Bank in Massachusetts to various banks in Florida, the following sums of money having a value of $5000 or more that derived from said unearned retainer fees, knowing said moneys to have been stolen, converted and taken by fraud . . . .

The Indictment then lists thirty-one payments ranging in date from May 24, 2000 to February 6,

2002.  Capoccia argues that because the earliest payment enumerated is May 24, 2000, the

Indictment cannot be construed to have alleged misconduct before that date.

The government, by contrast, maintains that Count One does allege misconduct occurring

---

[8]  Section 2314 contains five (unnumbered) paragraphs defining different violations of the statute.  18 U.S.C. § 2314.  The first proscribes the interstate transportation of stolen goods and moneys; the government and Capoccia agree that it was under this paragraph that Capoccia was charged.  *Id.*  The second paragraph, discussed below, prohibits inducing another to travel interstate in furtherance of a fraud.  *Id.*  The third, fourth and fifth proscribe the interstate transportation of, respectively, counterfeit securities, forged traveler's checks, and the tools of forgery and counterfeiting.  *Id.*

13

before May 24, 2000, pointing to Count One's reference to Capoccia's "scheme, between 1997 and 2002," and to the Count's statement that it "repeats and realleges" the prefatory paragraphs in the Indictment, some of which address pre-May 2000 conduct. This language, the government claims, effectively charges an over-arching scheme, commencing around 1997 and continuing until 2002, to transfer unearned retainer fees in interstate commerce. According to the government, this scheme should be understood to include the pre-May 2000 transfers described in paragraphs twelve and thirteen of the Indictment. These paragraphs, which appear in a section of the Indictment entitled "The Misappropriation of Client Retainer Fees," allege (among other things) that despite the Capoccia Law Centers' inability to pay timely and complete refunds of unearned retainer fees to withdrawing clients, the Law Centers transferred, between July 1998 and June 2000, approximately $1.7 million from its operating accounts to the accounts of Carol Capoccia for the benefit of Andrew Capoccia. The Indictment then lists fifty-nine discrete payments ranging in date from July 29, 1998 to June 23, 2000. Only the last two of these—one on May 24, 2000, and one on July 23, 2000—are repeated in Count One. The government contends that it was proper for the district court to order forfeiture of the proceeds of the pre-May 2000 payments because Count One should be understood to charge those payments, and Capoccia was convicted of that count.

The Indictment does not charge any misconduct prior to May 2000, however, either as part of an ongoing scheme or as discrete acts. As an initial matter, the language of Count One does not support the government's reading; while it refers to the existence of a scheme, it does not *charge* a scheme. Paragraph forty, the charging portion of the count, is eminently clear: it alleges that Capoccia "transmitted and transferred" sums of money, and lists numerous specific

14

instances of such transmissions and transfers. Nothing about the language in that paragraph suggests that these payments are illustrative of a scheme or that the list is otherwise non-exhaustive. This is in sharp contrast to Count Two, which identifies several payments as overt acts in furtherance of an ongoing conspiracy, and specifically limits the conspiracy to dates after July 1, 2000.

Moreover, the paragraph of § 2314 under which Capoccia was charged in Count One explicitly criminalizes only the "transport[ation], transmi[ssion], or transfer[]" of stolen property. 18 U.S.C. § 2314. It does not refer to, nor does it set forth as an element, a scheme to transport, transmit, or transfer such property. The absence of any reference to a scheme is particularly significant in light of its presence elsewhere in § 2314. *See Rabin v. Wilson-Coker*, 362 F.3d 190, 196 (2d Cir. 2004) ("If drafters choose to use one word in part of a statute and omit it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). The second paragraph of § 2314, which prohibits inducing another to travel in furtherance of a fraud, requires for conviction a finding that the defendant "devised or intend[ed] to devise" and then "execut[ed] or conceal[ed]" a "scheme or artifice to defraud."[9] *Id.* Other criminal statutes similarly define offenses either as actions taken pursuant to a scheme to defraud or as such schemes themselves. For example, the mail fraud and wire fraud statutes provide for the criminal punishment of those who, "having

---

[9] This second paragraph of 18 U.S.C. § 2314 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons . . . [shall be fined or imprisoned, or both].

devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing

such scheme or artifice," deposit matter for delivery by the Postal Service, 18 U.S.C. § 1341, and

transmit information by means of wire, radio, or television communication, 18 U.S.C. § 1343.[10]

The criminal conduct proscribed by the bank fraud statute, 18 U.S.C. § 1344, is itself the

"execut[ion], or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution."[11]

The variation in language between the first paragraph of § 2314 and these otherwise similar

statutes is significant. Namely, the first paragraph of § 2314—unlike those other

statutes—criminalizes *only* individual acts of transportation or transmission, not schemes or

actions taken pursuant to schemes. *Cf. United States v. Johnpoll*, 739 F.2d 702, 714 (2d Cir.

1984) (rejecting defendant's challenge that his indictment, which charged various acts of

transporting stolen securities as separate counts, was multiplicitous, because "[u]nder 18 U.S.C.

§ 2314 each interstate or foreign transportation of stolen securities constitutes a separate

violation of § 2314, even if the various acts of transportation are part of a single scheme"). Thus,

Count One's reference to a "scheme" beginning in 1997 provides background for the specific

allegations contained in the count, but does not allege a substantive violation of § 2314

---

[10] Capoccia was also charged, in Counts Five, Seven and Ten, and ultimately convicted, of violations of 18 U.S.C. §§ 1341 and 1343. The conduct described in those counts, however, occurs only in 2001 and later, and the government has not argued that they comprise any conduct occurring before that time.

[11] Title 18, section 1344 provides in full:
Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

encompassing the pre-May 2000 conduct.

Nor can Count One's incorporation of the earlier paragraphs of the Indictment be read to charge the pre-May 2000 payments as discrete acts. Paragraph thirteen does list those payments with specificity, and one could argue (as the government does) that an expansive reading of paragraph thirty-nine's "repeat[] and reallege[]" language would bring them into the ambit of conduct alleged by Count One. The assertions in paragraphs twelve and thirteen, however, are insufficient to charge the payments as violations of § 2314 because they fail to allege two elements of the offense: (1) that the monies were transmitted in interstate commerce;[12] and (2) that the defendant knew the monies were stolen, converted or taken by fraud.[13] *See United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991) (listing elements required to prove violation of § 2314); *see also United States v. Resendiz-Ponce*, — U.S. —, 127 S. Ct. 782, 788 (2007) (stating that one of two "constitutional requirements for an indictment" is "that it contains the

---

[12]  Paragraphs twelve and thirteen allege that the Capoccia Law Centers transferred the monies listed "from its operating accounts" to "bank accounts controlled by Carol Capoccia." Paragraph seven states that the Capoccia Law Centers maintained bank accounts first in New York and later in New Jersey, and paragraph eight states that Carol Capoccia maintained accounts in New York and Florida. The government contends that these two pieces of information establish "the interstate character of the money transfers"—albeit "less specific[ally]" than Count One did for the post-May 2000 payments—in a manner sufficient to "me[e]t constitutional and statutory requirements." We disagree. Because the Capoccia Law Centers and Carol Capoccia each maintained a bank account in New York, monies moved between those accounts would not have traveled interstate. Without the specific allegation that the transfers were in interstate commerce, as appears in paragraph forty, there is no way of knowing, from the information contained in the Indictment, which payments (if any) were interstate and which were not.

[13]  Paragraphs twelve and thirteen allege only that the Capoccia Law Centers experienced financial difficulties, that it failed to pay refunds to withdrawing clients or payments to creditors in a timely matter or at all, and that it nonetheless transferred the monies at the dates and in the amounts listed. Such information, even if true, does not establish that Capoccia (the defendant identified in Count One) knew the monies were "stolen, converted or taken by fraud."

17

elements of the offense charged" (internal quotation marks and alterations omitted)).[14] These paragraphs stand in sharp contrast to paragraph forty, the charging paragraph of Count One, which specifically alleges that Capoccia transmitted and transferred the listed monies—all after May 2000—"in interstate commerce" and "knowing said money to have been stolen, converted and taken by fraud."[15] Thus, even assuming that the facts recited in the Indictment are true and reading the Indictment "to include facts which are necessarily implied by the specific allegations made," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted), as the government urges us to do, the Indictment is insufficient to allege pre-May 2000 violations of § 2314.

Further, that Count One explicitly sets forth the post-May 2000 payments along with the appropriate allegations to make out a violation of § 2314, while remaining completely silent with respect to the pre-May 2000 payments, gives rise to the unavoidable inference that the government deliberately chose not to charge any pre-May 2000 violations of § 2314. As noted, the Indictment limited Count Two to a conspiracy beginning only on July 1, 2000. Moreover, a

---

[14] To the extent the government claims that the bank records provided to defense counsel during discovery can cure the Indictment's failure to allege the interstate element of § 2314 with respect to these payments, we reject the argument. At an absolute minimum, an indictment must specify the elements of the offense charged, *see Resendiz-Ponce*, 127 S. Ct. at 788, even if additional facts necessary to give a defendant complete notice of the crime he is alleged to have committed may in certain circumstances be supplied through discovery, *see United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("When an indictment delineates the elements of a charged offense, however concisely, the underlying concerns of proper pleading . . . may be further promoted by a bill of particulars or pre-trial discovery.").

[15] Paragraph forty repeats almost exactly the list of *post*-May 2000 payments set forth earlier in paragraph sixteen, which is similar in structure to paragraph thirteen. Paragraph sixteen, like paragraph thirteen, does not allege the appropriate elements for the post-May 2000 payments. Presumably that is why the government repeated these payments in Count One, this time alleging the necessary elements.

18

colloquy during the trial proceedings suggests that the government deliberately chose not to charge conduct before May 2000 because it did not believe it could establish venue in Vermont for that conduct, which occurred in Albany, New York.[16]  The government's conclusion that it would be difficult to establish venue was likely correct, as venue lies for a § 2314 offense only in those districts "from, through, or into which" the stolen property moves—i.e., for the pre-May 2000 transfers, from banks in New Jersey and New York to banks in New York and Florida, but not Vermont.  18 U.S.C. § 3237(a) (providing that any "offense involving . . . transportation in interstate or foreign commerce" is a "continuing offense" for which venue lies in those jurisdictions "from, through, or into which such commerce . . . moves"); *see United States v. Maldonado-Rivera*, 922 F.2d 934, 968 (2d Cir. 1990) (relying on § 3237(a) to hold that for § 2314 offenses, venue lies in state where original theft occurred).  The government could have established venue in Vermont if, as it did in Count Two, it had alleged an ongoing conspiracy under 18 U.S.C. § 371 to violate § 2314.  *See United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (holding that for a conspiracy charge, "venue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act

---

[16]  Responding to defense counsel's argument during the trial proceedings that the district court should instruct the jury to consider evidence of pre-May 2000 conduct only as background, one of the government's attorneys admitted that Count One *did not* allege such conduct because of venue concerns, though he argued that evidence of the uncharged conduct was nonetheless admissible to prove the post-May 2000 charged conduct.  *See* Trial Tr., Mar. 24, 2005, at 170 ("Count 1 of the indictment alleges transfers that took place after the move to Vermont in 2000 because we only have venue as to those particular transactions but our argument always was and has been that earlier transactions which may not provide venue in Vermont as a unitary basis for prosecution are still, still part of a common scheme or plan and are admissible as proof of that particular count.") (statement of government attorney Waples); *see also id.* at 175 (responding to judge's comment that "the actual amounts that we're talking about [in Count One] are only after 2000" by stating:  "Right.  That's for venue purposes alone, Judge, not because we didn't perceive that there was criminal activity that preceded it").

in furtherance of the conspiracy was committed by any of the coconspirators"). Apparently, though, the government chose not to do so. *See* Trial Tr., Mar. 24, 2005, at 175-76 ("Well, *we didn't allege a conspiracy with respect to that conduct* [in Count One]. We were charging Mr. Capoccia alone acting by himself." (emphasis added)) (statement of government attorney Waples).

For the foregoing reasons, we hold that the Indictment does not charge that the pre-May 2000 transfers violated § 2314. Because the charged paragraph of that statute prohibits the act of transmitting stolen property in interstate commerce, not schemes to effect such transmissions, the government's failure to allege specifically the elements of a § 2314 offense with respect to the pre-May 2000 transfers is dispositive. We emphasize that our holding is compelled by the language of the charged paragraph of § 2314: if Count One charged an offense under a statute—such as, for example, the conspiracy statute, 18 U.S.C. § 371, as did Count Two—that did proscribe or even refer to a scheme to defraud, a conspiracy or an enterprise, our conclusion could be different. *Cf. United States v. Dupre*, 462 F.3d 131, 140-41 (2d Cir. 2006) (finding no constructive amendment of indictment (only a variance) where count charged wire fraud and identified a particular transfer, but government proved only other transfers at trial, because "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment").

*B. Forfeiture of Pre-May 2000 Monies*

Given Count One's failure to charge pre-May 2000 conduct, the government is entitled to criminal forfeiture of funds moved in pre-May 2000 transfers only if it has established the requisite nexus between those monies and the post-May 2000 conduct of which Capoccia was

20

charged and convicted. We find that it has not done so.

The Federal Rules of Criminal Procedure require that "[i]f the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1). The "requisite nexus" for a violation of 18 U.S.C. § 2314 is set forth in 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various sections of Title 18] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) defines "specified unlawful activity" as, *inter alia*, "any act or activity constituting an offense listed in section 1961(1) of this title," with an exception not relevant here. Section 1961(1), within the definitional section of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), defines "racketeering activity" as, *inter alia*, "any act which is indictable under . . . sections 2314 and 2315 [of Title 18] (relating to interstate transportation of stolen property)." 18 U.S.C. § 1961(1)(B). While § 981 authorizes only civil forfeitures, the forfeitable property it describes is made subject to criminal forfeiture by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, § 16, codified at 28 U.S.C. § 2461(c) (providing for the criminal forfeiture of any property for which forfeiture "is authorized in connection with a violation of an Act of Congress . . . but no specific statutory provision is made for *criminal* forfeiture upon conviction" (emphasis added)).[17] Sentencing

---

[17] In 2006, Congress amended 28 U.S.C. § 2461(c) so that it read:
If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense

21

courts determine forfeiture amounts by a preponderance of the evidence. *See United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005).[18]

Under 18 U.S.C. § 981(a)(1)(C), the government is entitled to forfeiture of funds that "constitute[] or [are] derived from proceeds traceable to a violation" of § 2314. The violation on which the forfeiture is based must be the specific violations of which Capoccia was convicted, not some other, separate § 2314 violations. *See* 18 U.S.C. § 981(a)(2)(A) (defining "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto"); 28 U.S.C. § 2461(c) (providing for forfeiture in connection with a "violation" with which a person "is charged in an indictment or information," upon "conviction" for that violation). Requiring the government to link assets to specific crimes of conviction is not only consistent with the punitive purposes of criminal forfeiture, s*ee Libretti*, 516 U.S. at 39-40, but also implements Congress's intent in enacting CAFRA. The legislative history of that Act suggests that § 2641(c) was designed to prevent abuse of the civil forfeiture process in part by encouraging the government to seek

---

giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case . . . .

USA PATRIOT Improvement and Reauthorization Act of 2005, Mar. 9, 2006, Pub. L. No. 109-177, Title IV, § 410, 120 Stat. 246. The version cited in the text is the one in place at the time of Capoccia's conviction, and unless otherwise noted, citations in this opinion to 28 U.S.C. § 2461 refer to the unamended version.

[18] The Supreme Court has held that criminal forfeiture is "an aspect of punishment imposed following conviction of a substantive criminal offense," and that there is no Sixth Amendment jury trial right to a forfeiture determination. *Libretti*, 516 U.S. at 39, 49. This Court has applied *Libretti* since the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005), and has held that preponderance of the evidence remains the appropriate standard by which to determine forfeiture. *See Fruchter*, 411 F.3d at 383.

22

forfeiture through criminal proceedings, where it would have to link targeted property to a specific criminal conviction. *See* H.R. Rep. 106-192, at 8 (1999) (describing perceived abuses of civil forfeiture process, which were possible in part because government could seize property without linking it to a criminal conviction); 146 Cong. Rec. S1753-02 (explaining purpose of section eventually codified at § 2641(c)) (statement of Sen. Hatch); *see also* CAFRA § 16, 114 Stat. at 221 ("Encouraging Use of Criminal Forfeiture as an Alternative to Civil Forfeiture").

In the instant case, the government has not established (nor logically could it) that the funds involved in the pre-May 2000 transfers were "obtained . . . as the result" of the later, particular transfers of which Capoccia was convicted. 18 U.S.C. § 981(a)(2)(A). Thus, the district court should not have ordered forfeiture of those pre-May 2000 monies. *Cf. United States v. Juluke*, 426 F.3d 323, 328 (5th Cir. 2005) (per curiam) (holding that government was not entitled to forfeiture of seized jewelry under 18 U.S.C. § 853(a), which provides for forfeiture of property constituting or derived from proceeds of controlled substances violation, because the government had not proved that the jewelry "was proceeds of the drug activity that formed the basis for Juluke's convictions").

The government counters that this and other courts have ordered forfeiture of property derived from uncharged and acquitted conduct that is part of the same scheme or enterprise as convicted conduct, and that here, it has established that the uncharged pre-May 2000 conduct and the charged post-May 2000 conduct are part of a common scheme. The cases the government has cited, however, turned on the fact that, unlike in this case, the bases for the forfeiture orders were convictions for schemes, conspiracies, or enterprises. Thus, the government in those cases was able to prove that the funds involved in the uncharged or acquitted execution nevertheless

23

constituted the proceeds of, or was traceable to, or was involved in, the crime of conviction.

For example, *United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003), held that a jury could consider evidence of mail and wire frauds "adduced by the government in support of the money laundering count, though not charged as separate substantive counts of mail or wire fraud," in determining the amount of forfeiture to impose on the defendant. *Id.* at 1279. But the relevant count of conviction in that case was for conspiracy to launder the proceeds of mail and wire fraud, and the mail and wire fraud statutes themselves require the existence of a scheme to defraud. *Id.* at 1269. Indeed, the court specifically cautioned that "[w]e do not mean to imply that a court could impose a forfeiture order based on a money laundering offense with which the defendant was not charged or for which he was acquitted." *Id.* at 1279 n.19.

Similarly, in *United States v. Boesen*, 473 F. Supp. 2d 932 (S.D. Iowa 2007), the court ordered the defendant, who had been convicted of health care fraud, to forfeit the proceeds of "additional executions of the scheme not specifically charged as substantive counts, but which fall within the boundaries of the overall scheme." *Id.* at 952. But health care fraud is defined as the knowing and willful execution of "a scheme or artifice . . . to defraud any health care benefit program," 18 U.S.C. § 1347, and the court made clear that its decision rested on that fact: "The statute criminalizes executions of the scheme; the overall scheme is thus inherently part of the offenses of which Defendant has been convicted." *Id.* at 953.

In the RICO context, we have held that a defendant may be required to forfeit all proceeds of the racketeering enterprise forming the basis of his conviction, including proceeds of particular racketeering activities of which the defendant was not convicted. *See United States v. Gotti*, 459 F.3d 296, 346-47 (2d Cir. 2006); *Fruchter*, 411 F.3d at 384; *see also United States v. Hively*, 437

24

F.3d 752, 763 (8th Cir. 2006) (holding that defendants convicted of racketeering in violation of RICO may be made to forfeit proceeds arising from specific predicate acts of which they were acquitted). But as we explained in *Fruchter*, in such a case "the defendant 'is not being punished . . . for committing the substantive acts found to be "not proven." He is being punished for conducting the affairs of an enterprise through a pattern of racketeering activity.'" 411 F.3d at 384 (quoting *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir. 2002)).

Thus, it is somewhat misleading to characterize these cases as authorizing forfeiture of proceeds traceable to "acquitted" or "uncharged" conduct; they rely instead on the breadth of the conduct forming the basis of the offense of conviction. Where the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the "requisite nexus," Fed. R. Crim. P. 32.2(b)(1), to that scheme, conspiracy, or enterprise. As we have explained, however, Capoccia's conviction under Count One is not for a scheme, conspiracy, or enterprise, because 18 U.S.C. § 2314 prohibits only individual instances of transferring stolen money. Funds received from the pre-May 2000 uncharged transfers are not proceeds of, and thus do not have the "requisite nexus" to, the post-May 2000 payments forming the basis of Capoccia's conviction.[19] We therefore hold that the district court erred in ordering forfeiture of the pre-May

---

[19] Capoccia was also convicted on several other counts, but the government has not advanced the position that the pre-May 2000 assets are forfeitable in connection with any of them, apparently recognizing that no other count plausibly supplies a basis for forfeiting these monies. Count Three, like Count One, alleges a violation of 18 U.S.C. § 2314, but the earliest payment alleged is December 5, 2000. Count Four charges receipt of stolen property that has crossed state boundaries on February 5, 2001, in violation of 18 U.S.C. § 2315, which, like § 2314, makes no mention of a scheme to defraud. Counts Five, Seven and Ten charge wire and mail fraud under 18 U.S.C. §§ 1341 and 1343, both of which, as described above, require the existence of a scheme to defraud as an element; however, those counts allege that Capoccia

25

2000 monies.

## CONCLUSION

Because the district court did not err in consulting the trial record, but erred in ordering Capoccia to forfeit the pre-May 2000 monies, we AFFIRM the Final Order of Forfeiture in part, VACATE it in part, and REMAND for further proceedings consistent with this decision.

diverted funds from clients' escrow accounts—conduct which appears to have begun only in 2001. The government has not alleged that the escrow account schemes were of a piece with the unearned retainer fee scheme. Finally, as noted previously, Count Two alleges a conspiracy, but expressly limits its dates as "[c]ommencing on or about July 1, 2000."