RICE, District Judge,
dissenting.
I respectfully dissent. In my view, genuine issues of material fact preclude summary judgment on the question of whether the investor funds used to purchase the cashier’s checks are, in fact, traceable to the conspiracy to defraud, and on the question of whether Claimant Vernon Smith can establish the “innocent owner” defense. I would therefore vacate the district judge’s orders and remand the case for an evidentiary hearing.
The government bears the burden of proving, by a preponderance of the evidence, that the property at issue is subject to forfeiture. See 18 U.S.C. § 983(c). Here, the cashier’s checks at issue are subject to forfeiture only to the extent that the investor funds used to purchase them *246 are traceable to the conspiracy to commit mail fraud. All property obtained directly or indirectly as a result of the “scheme or artifice to defraud” is subject to forfeiture. See 18 U.S.C. § 981(a)(1)(E).
It appears to be undisputed that the investor funds that were ultimately used to purchase the $60,649.64 cashier’s check were received by Target Oil and Gas (“Target”) and deposited in the First Southern National Bank account between May and July of 2003. Likewise, it is undisputed that the $75,000 used to purchase the $100,000 cashier’s check was deposited in the Whitaker Bank account on April 9, 2004. The district court found that this $75,000 deposit was traceable to Target’s sale of an IR compressor, originally purchased by Target in late 2003 with investor funds.[1]
Assuming arguendo that all of the investor funds used to purchase the two cashier’s checks were received by Target in 2003, the key question is whether these funds were obtained as a result of the “scheme or artifice to defraud.” As the district court correctly noted, the funds were received from Target investors during the time period of the conspiracy as alleged in the criminal indictment, “[f]rom on or about February 18, 2003, and continuing through on or about February 2008.” However, in my view, under the unique circumstances of this case, that fact is not dispositive.
In order to obtain a conspiracy conviction, the government need not prove the exact temporal boundaries of the conspiracy. See United States v. Willis, 232 Fed. Appx. 527, 538 (6th Cir.2007) (“the exact date of the conspiracy is not an element of the crime.”); United States v. Ford, 872 F.2d 1231, 1236 (6th Cir.1989) (“When ‘on or about’ language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established.”). Therefore, the dates alleged in the indictment are not dispositive concerning the temporal scope of the conspiracy.
Here, the indictment alleges that the conspiracy began “on or about February 18, 2003.” Yet, the first overt act alleged did not occur until March 24, 2004, when Target mailed a packet of materials to an investor. The indictment itself alleges no specific acts of wrongdoing between February 18, 2003, and March 24, 2004.[2] This is the crucial time period during which all of the investor funds used to purchase the cashier’s checks were received by Target.
In United States v. Rogers, 769 F.3d 372, 380-81 (6th Cir.2014), recently re-designated as a published opinion, the court held that a mail fraud conspiracy conviction under 18 U.S.C. § 1349 does not require proof of an overt act. This, however, does not change the fact that the cashier’s checks at issue in this case are not subject to civil forfeiture unless the Government proves that the investor funds used to purchase them were obtained as a result of *247 the fraudulent scheme. See 18 U.S.C. § 981(a)(1)(E). This necessarily requires a determination of when the fraudulent scheme began. The district court points to no evidence in the record to support a finding that the conspiratorial agreement was already in existence in 2008 when Target received the investor funds at issue. Absent such a finding, it cannot be said that the funds were obtained as a result of the alleged conspiracy to defraud. In my view, the district court erred in determining, as a matter of law, that the Government satisfied its burden of proving that the cashier’s checks were subject to forfeiture. An evidentiary hearing is needed to determine when the conspiracy came into being.
In reliance on United States v. Warshak, 631 F.3d 266 (6th Cir.2010), the district court found that the scheme to defraud investors was “so pervasive” that “any money taken from investors [sic] funds can be considered the proceeds of a scheme or artifice to defraud.” The majority’s endorsement of this same view is, in my opinion, flawed.
Vernon Smith maintains that all investor funds deposited to Target’s accounts in 2003 were derived from legitimate investor transactions that pre-dated any wrongdoing, and that the court’s “pervasive fraud” approach, as applied in this ease, contravenes the statutory requirement that only those proceeds traceable to the conspiracy to defraud are subject to forfeiture. I agree.
Warshak is factually distinguishable. In that case, defendants sold herbal supplements that purportedly enhanced male sexual performance. From its inception, the product was bogus. The doctors who purportedly developed the supplement were entirely fictitious, and the advertisements touted fictitious consumer satisfaction studies. Defendants were convicted of fraud and ordered to forfeit $459 million in proceeds, the entirety of their company’s revenue. Defendants appealed that decision, arguing that, although there was evidence of fraud early on, they thereafter ran a legitimate business. They argued that the portion of revenue earned after 2003 was. not subject to forfeiture. The court disagreed, concluding that the fraudulent scheme was so pervasive that all revenue was subject to forfeiture. The court found that, even though the company “attempted to affect an air of legitimacy, the very nucleus of its business model remained rotten and malignant,” and the “entire operation was permeated with fraud.” Id. at 332. The court rejected the argument that the later sales were legitimate, concluding that all sales were the outgrowth of the company’s fraudulent beginnings. Id.
In contrast to Warshak, Target’s beginnings were apparently legitimate. Notably, of the more than $15 million in investor funds received by Target, the government alleged that only $3.2 million was fraudulently obtained. Moreover, of Target’s more than 150 well projects, only seventeen of those projects were the subject of the indictment. This implies that a significant portion of Target’s business transactions were not tainted by fraud. The court’s “pervasive fraud” approach, as applied to the facts of this particular case, can lead to a result that is contrary to law, given that unless the funds at issue are traceable to the conspiracy, they are not subject to forfeiture.
Vernon Smith notes that the jury acquitted the defendants on many of the counts of mail fraud, and the jury found fraud in connection with just eight well projects. None of the investor funds that were used to purchase the cashier’s checks were traceable to those eight projects. Smith *248 argues that, in determining which funds were subject to forfeiture, the district court should have focused its inquiry solely on those well projects for which defendants were charged and convicted. This argument lacks merit. Because Michael Smith was convicted of conspiracy, the court may also consider uncharged and acquitted conduct that falls “within the boundaries of the overall scheme.” United States v. Capoccia, 503 F.3d 103, 117 (2d Cir.2007) (quoting United States v. Boesen, 473 F.Supp.2d 932, 952 (S.D.Iowa 2007)). See also United States v. Yass, 636 F.Supp.2d 1177, 1185 (D.Kan.2009) (“Courts have ordered forfeiture of property derived from uncharged and acquitted conduct that is part of the same scheme or enterprise as convicted conduct, relying on the breadth of the conduct forming the basis of the offense of conviction.”); United States v. Venturella, 585 F.3d 1013, 1017 (7th Cir.2009) (noting that the civil forfeiture statute “contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction.”).
Nevertheless, one cannot determine which property is subject to forfeiture without first identifying the “boundaries of the overall scheme.” In this case, for the reasons set forth above, the temporal boundaries of that scheme have not been sufficiently defined. The government must prove, by a preponderance of the evidence, that the conspiracy to defraud was in existence when the investor funds at issue were acquired by Target. If those funds were acquired before the conspiracy was formed, they cannot logically be deemed “proceeds” of the conspiracy, and would not be subject to forfeiture. For this reason, an evidentiary hearing is required.
The question of when the conspiracy to defraud began is also crucial to determining whether Vernon Smith can establish that he is an “innocent owner” of at least some of the funds at issue. An innocent owner’s interest in property is not subject to forfeiture. 18 U.S.C. § 983(d)(1). The relevant statutory provision reads as follows:
With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term “innocent owner” means an owner who—
(i) did not know of the conduct giving rise to forfeiture; or
(ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.
18 U.S.C. § 983(d)(2)(A). In this case, Vernon Smith knew nothing of the conduct giving rise to the forfeiture of the cashier’s checks. The key issue is whether Vernon Smith’s property interest in those cashier’s checks arose before or after the illegal conduct at issue took place.
Vernon argues that Michael gave him the money to repay a loan made more than thirty years earlier. Assuming arguendo that this is true, it was an unsecured loan. As such, Vernon had no protectable property interest in the outstanding debt. See 18 U.S.C. § 983(d)(6)(B)(i) (providing that the term “owner” does not include “a person with only a general unsecured interest in, or claim against, the property or estate of another”). Vernon’s property interest in the money did not arise until Michael gave it back to him and he exercised control over it. With respect to the money used to purchase the first cashier’s check, it appears that Michael gave Vernon these funds between May of 2003 and August of 2004. The second cashier’s check was purchased with funds given to Vernon by Michael on April 9, 2004.
*249 Again, although these dates fall within the temporal scope of the conspiracy, as alleged in the indictment, it is not clear when the conspiracy was actually formed. Until the date that “the illegal conduct giving rise to forfeiture” is determined, it is impossible to decide whether the “innocent owner” defense, as set forth in § 983(d)(2)(A), is applicable. At the very least, there is a possibility that Vernon Smith could be deemed the “innocent owner” of some portion of the funds that Michael gave him in 2003.
For these reasons, I believe that the district court erred in granting the government’s motion for summary judgment and in denying Vernon Smith’s request for an evidentiary hearing. I would therefore vacate the district court orders and remand the case for further proceedings.

. Vernon Smith maintains that the $75,000 deposit instead resulted from the sale of a drill rig by Kentucky-Indiana Oil & Gas and involved no tainted investor funds.

. In fact, the year 2003 is mentioned just one other time in the indictment. Paragraph 11 alleges that: "As part of the conspiracy, the Defendants intentionally failed to disclose to potential investors numerous material facts, including, but not limited to: ... that the Kentucky Department of Financial Institutions entered into an Agreed Order with Target Oil and Defendant Michael Smith on February 14, 2003," concerning the accreditation of potential investors and the provision of offering circulars. Although the Agreed Order was allegedly signed in February of 2003, it is not clear when the alleged intentional concealment took place.